UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

TRACY MCDONALD,                         )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )
                                        )
JOHN E. POTTER, Postmaster General,     )        No. 1:06-CV-1
                                        )        *Lee*
            Defendant.                  )
                                        )

## MEMORANDUM AND ORDER

### I.    Introduction

Before the Court is the motion of Defendant, John E. Potter, Postmaster General, United

States Postal Service ("Defendant" or "USPS"), for summary judgment pursuant to Fed. R. Civ. P.

56 [Doc. No. 41]. Defendant filed a memorandum [Doc. No. 42] with exhibits [Doc. No. 43] in

support of his motion.  Plaintiff Tracy McDonald ("Plaintiff") filed a response in opposition [Doc.

No. 56] with exhibits [Doc. No. 57].[1]  Defendant also filed a reply brief [Doc. No. 61].  Oral

argument was held on the motion on August 3, 2007.  Consequently, Defendant's motion is now ripe

for review.  For the reasons which follow, Defendant's motion for summary judgment [Doc. No. 41]

will be **GRANTED** and Plaintiff's claims against Defendant will be **DISMISSED WITH**

**PREJUDICE**.

---

[1] The parties' manually filed exhibits are extensive.  Throughout this memorandum and order, Defendant's exhibits are referred to as [Doc. No. 43, Exhibit __] and Plaintiff's exhibits are referred to as [Doc. No. 57, Exhibit __].  Where both parties have submitted a copy of the same document as an exhibit only one has been cited in this memorandum and order.

## II.     Procedural and Factual Background

### A.     Procedural History

Plaintiff's first contact with an Equal Employment Opportunity Commission ("EEOC" or "EEO") counselor was on May 11, 2001 [Doc. No. 43, Exhibit A-1]. In her information for pre-complaint counseling, Plaintiff stated on May 3, 2001, she smelled a fragrance on two co-workers working beside her and moved [*id.* at 1]. Plaintiff handed a note to a supervisor, Hannah Rogers ("Rogers"), asking if she would speak to the co-workers when she went to lunch [*id.*]. After lunch, one of the co-workers was still present, and Rogers stated the worker denied wearing anything scented. Rogers said she could not smell a scent on the co-worker [*id.*]. As a remedy, Plaintiff requested, *inter alia*, a "[f]ragrance ban instituted immediately [and] enforced [with] consequences for violators." [*Id.* at 2]. This complaint was designated EEOC case No. 4H-370-0176-01 [*id.* at 1; Exhibit A-2].

Plaintiff made another contact with an EEOC counselor on February 4, 2003, after she was given a Letter of Warning ("LOW") on January 14, 2003 [*id.*, Exhibit B-1 at 1; Exhibit B-2]. This case was designated as EEOC case 1H-379-0001-03 [*id.*].

In a decision issued on November 1, 2004, an EEOC administrative law judge ("ALJ") granted partial summary judgment denying several of Plaintiff's claims and set the remainder of Plaintiff's claims for an administrative hearing [*id.* at 43-47]. On September 27, 2005, following an administrative hearing that included six days of testimony, the ALJ found the USPS did not discriminate against Plaintiff based upon any of her claims [*id.*, Exhibit C-2 at 77-81, 84]. On October 6, 2005, the USPS issued its notice of final action on Plaintiff's claims [*id.*, Exhibit C-1].

Plaintiff filed her complaint in district court on January 6, 2006, asserting claims under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. [Doc. No. 1 at 1]. Plaintiff asserts she is an employee of Defendant with a disability as defined in the ADA [*id.* at ¶¶ 4, 5]. Plaintiff asserts she is disabled by the medical impairments of migraines and vascular rhinitis (fragrance sensitivity) [*id.* at 2, ¶ 11]. Plaintiff alleges that exposure to fragrances in her environment results in "debilitating Migraine headaches." [*Id.*]. Plaintiff further asserts she is also disabled by a back condition, *i.e.*, disc protrusion with lumbar radiculopathy [*id.* at ¶ 12]. Plaintiff alleges these impairments interfere with and limit her major life activities of "caring for herself, working, performing manual task[s], breathing, thinking, walking and lifting." [*id.* at ¶ 13].

Plaintiff asserts that while employed by Defendant she was exposed to heavy fragrances worn by her co-workers which resulted in migraine headaches [*id.* at 2-3, ¶¶ 15, 16]. Plaintiff alleges that despite being on notice of her need for accommodation, "Defendant refused to provide Plaintiff with effective accommodations made necessary by her physical impairment." [*Id.* at 3, ¶ 17]. Specifically, Plaintiff asserts Defendant "refused to either implement a fragrance ban as it previously had, or to enforce the stated policy of light wearing of fragrances." [*Id.*]. Plaintiff also asserts Defendant "used harsh cleaning chemicals during the Plaintiff's shift and have refused to remove a fragrance sprayer from the restroom." [*Id.* at ¶ 21]. Plaintiff further asserts that the continued presence of strong fragrances on the work floor has resulted in her having "to move frequently from work station to work station, aggravating her back condition." [*Id.* at ¶ 22].

Plaintiff asserts that after she filed a complaint with the EEOC, Defendant's agents required her to undergo a fitness for duty examination in retaliation for her protected activity [*id.* at 3-4, ¶ 23]. Plaintiff further asserts that as the result of Defendant's agents ignoring her complaints, her "absenteeism rate was increased and the benefits of employment to which she was otherwise entitled

were withheld from her," including, "performance awards as well as promotions to desired positions and a demotion from higher level work that she had been allowed to perform." [*Id.* at 4, ¶ 24]. Finally, Plaintiff asserts that as the result of her continuing complaints and efforts to protect her rights, Defendant's agents subjected her "to continued retaliation in the form of harassment and heightened disciplinary standards." [*Id.* at 25].

**B.     Claims**

Plaintiff presents the following claims:

1.     Whether Defendant was required to, and failed to, reasonably accommodate Plaintiff's migraine condition since March of 2001; namely, fragrance and heat sensitivity, *i.e.*, requests to control the odors from co-workers fragrances and cleaning supplies and paint in the work place;

2.     Whether Defendant was required to, and failed to, reasonably accommodate Plaintiff for her back condition since March of 2001 (*i.e.*, requests to limit her moving from work station to work station);

3.     Whether Defendant retaliated against Plaintiff for protected EEO activity when it sent her for a Fitness for Duty medical examination on July 17, 2001;

4.     Whether Defendant retaliated against Plaintiff for protected EEO activity when she was issued a LOW for absenteeism on January 14, 2003;

5.     Whether Defendant retaliated against Plaintiff for protected activity when she was not selected as an Acting or 204B Supervisor; rather than Dana Wheeler on March 3, 2003;

6.     Whether Defendant discriminated against Plaintiff due to a disability when she was removed from performing a higher level clerk (Level 5 rather than Level 4); namely, training Level 4 clerks during the

implementation of a new "flat" system at her work
site on or about June 6, 2002; and

7.      Whether Defendant created a "hostile work
environment" on the basis of a disability or retaliation
for prior protected EEO activities from September
1999 to November 2004.

[Doc. No. 56 at 6; Doc. No. 42 at 1-2].

C.      **Facts**

Apparently as a result of days of hearing testimony, depositions and medical examinations,

the factual information submitted by both parties is quite voluminous.  The facts are, however,

largely undisputed.  The material facts relied upon in this memorandum and order are either

uncontroverted or, if controverted, viewed in the light most favorable to Plaintiff.

1.      **The REC**

Plaintiff is one of approximately 750 Data Conversion Operators ("DCOs") employed at the

Chattanooga Remote Encoding Center ("REC") operated by the USPS [Doc. No. 43, Exhibit E,

Declaration of John McCollum (McCollum")].  The REC has a large room, approximately 104 feet

by 128 feet, with rows of computer monitors and keyboards and a rolling secretarial-type chair at

each work station. [*id.* at ¶ 4].  The room is carpeted, and there is a small divider between each work

station [*id.*].

The REC receives images of mail, via "LAN lines" from 27 different mail processing sites

across the Southeastern United States and two mail processing sites in the New York area, which

cannot be read by mail processing machines at the sites [*id.* at ¶ 5].  In 2003, the REC had 28 areas

of the workroom floor designated to receive images of letters from mail processing sites and five

areas designated to receive images of "flats," which are mail images larger than letters such as

magazines [*id.*].  The REC is configured so that images from particular mail processing sites are sent to particular computers on the workroom floor via dedicated computer lines [*id.*].

The DCOs at the REC key into their computer a code of the address on the image shown on their computer monitors, and this information is transmitted back to the mail processing site, causing the correct barcode to be placed on the mail [*id.* at ¶ 6].  The images received from the mail processing sites vary throughout the day, which necessitates moving the operators to different work stations where the images are received [*id.*].

Several hundred employees work on the same work shift, which is called a "tour," at the REC [*id.* at ¶ 7].  Because tours overlap, Plaintiff could come into contact with approximately 500 people during the workday [*id.*].  The REC currently employs approximately 800 people and expects to hire more [*id.* at ¶ 2].  McCollum stated the heaviest shift is Tour 3 from 3:00 p.m. to about 11:30 p.m., because that coincides with the time when most of the mail in the country is collected [Doc. No. 57, Exhibit 20 at 31].  McCollum stated that starting times for people on Tour 3 are staggered, employees arrive at 3:00, 3:30 and 4:00 p.m., and most of the transitional employees ("TEs"), who are coming from other jobs, arrive at 5:30 and 6:00 p.m. [*id.* at 32].  McCollum stated that some of the employees on Tour 3 work four hours, some work six hours, some work seven and one-half hours, and some work eight hours [*id.*].

Plaintiff began working at the REC in October 1994 [Doc. No. 43, Exhibit G at 28].  Plaintiff works from 3:30 p.m. to midnight, with two off days [*id.* at 31].  In the past, Plaintiff and a number of her friends, including Patrish Garvich ("Garvich")[2], worked together on images received from the

---

[2]  Plaintiff and Garvich both claim to have fragrance-induced migraines and vasomotor rhinitis, diagnosed by the same doctors and both filed cases with the EEOC [Doc. No. 43, Exhibit I at 17-22; Exhibit J at 44-45].

Jacksonville (Florida) site [*id.*, Exhibit H at 116-17; Exhibit F at 183-87; Exhibit J at 43-44]. The images from the Jacksonville site were sent to a designated group of computers, so Plaintiff could sit at the same set of computers for more of the workday [*id.*].

However, at some point, management at the REC reconfigured the workforce and made the jobs non-site specific [*id.*, Exhibit H at 117; Exhibit F at 182-90]. As the technology improved and the computer equipment was able to read more mail, fewer images were received from a particular mail processing site, the result being DCOs had to be moved around to different computer work stations [*id.*]. This resulted in some of the employees who worked together on the Jacksonville site mail having different off days and also changed where and by whom they sat next to in the REC [*id.*, Exhibit F at 81-82; Exhibit I at 12-13].

### 2. Plaintiff's Alleged Disabilities

Plaintiff testified during her deposition and also during the EEOC administrative hearing. Plaintiff testified she has two disabilities: (1) migraines with vasomotor rhinitis and (2) a back condition [*id.*, Exhibit G at 40-41].[3]

### a. Migraine/Fragrance Sensitivity Impairment

Plaintiff testified her migraines started in 1978 after a car wreck and go in and out of remission [*id.* at 41-50]. Although she has been having migraines since 1978,

> The migraines never rose to the level of a disability until the fragrance sensitivity kicked in. And it wasn't until working here where I was bombarded with so many fragrances that I started to become sensitized to more and more things. And then it became a

---

[3] Part of the record consists of daily notes taken by the Plaintiff [Doc. No. 43, Exhibit N]. In her notes, Plaintiff had complaints about many issues in addition to fragrances, including changes in her days off, images on her computer monitor not being centered, broken lights in the REC parking lot, and wanting "assigned" seats [*id.*].

really serious problem.

[*Id.*, Exhibit H at 98].

Plaintiff stated she believes her fragrance sensitivity was the result of another automobile accident in 1990[4] [*id.*, Exhibit F at 150; Exhibit H at 102].  Her migraines became more frequent in 2001 and have continued at about the same frequency since then [*id.*, Exhibit G at 68].  Plaintiff testified that when she has a migraine, she stays in bed for as long as two days [*id.* at 69].  Plaintiff stated her migraines are unpredictable and occur at different times of the day and week [*id.* at 67].

Until recently, but during the period relevant to the issues in this action, Plaintiff lived alone in an apartment with six cats [*id.* at 67-69].  Plaintiff stated she was able to care for her six cats and changed their litter daily [*id.* at 69-70].  She stated she is not bothered by the odors from her cats [*id.* at 70].  Plaintiff testified she did her own grocery shopping and cleaning [*id.* at 68, 70; Exhibit I at 103].  Plaintiff used lemon-scented wipes to clean her house [*id.*, Exhibit G at 70].  At various times, Plaintiff also used Clorox wipes, Windex wipes and Pledge wipes, which she stated started to bother her shortly before the administrative hearing because she asserts she is becoming "increasingly more sensitive to things" [*id.*, Exhibit G at 71; Exhibit I at 104].  Plaintiff testified that in 2003 she used Pine-Sol for cleaning and that it did not bother her [*id.*, Exhibit G at 72].  However, by the time of her administrative hearing in 2004, she stated Pine-Sol did bother her [*id.*].

There was a flood at Plaintiff's apartment and Plaintiff testified she cleaned her apartment herself with bleach and water on May 11 and 12, 2004 [*id.* at 71].  Plaintiff stated she was at home due to a migraine when the flood hit on May 11, 2004 [*id.* at 73].  Plaintiff admitted that although

---

[4]  Plaintiff worked as a bartender during the 1980s, but stated she did not have fragrance sensitivities while bartending [*id.*, Exhibit F at 148-50].

the bleach she used aggravated her migraine, she did the cleaning herself [*id.* at 71-73, Exhibit I at 105-07]. Plaintiff was not off work as the result of using the bleach and records for leave year 2004, show Plaintiff worked on both May 13 and 14, 2004 [*id.* at 105-08, Exhibit E, attachment 2].

Plaintiff also testified she used Ivory soap, scented shampoo from a hair salon, hair gel, and hair spray [*id.*, Exhibit G at 208-210, Exhibit I at 108-09]. She uses unscented laundry detergents [*id.*; Exhibit I at 108-09]. Plaintiff further testified that scents from toothpaste and mouthwash did not bother her [*id.*, Exhibit I at 108-09]. In addition, Plaintiff testified she goes to stores, and went to one store's perfume counter once [*id.*, Exhibit K at 167-70]. Plaintiff also goes out to eat with friends, using them as a "shield from fragrances" in the restaurant [*id.*, Exhibit K at 117].

Plaintiff testified that she can detect the smell of a fabric softener from three or four rows of computers away at the REC [*id.*, Exhibit I at 111]. She also testified she can smell the "vapor trails" of people after they are gone [*id.*, Exhibit K at 182]. Plaintiff testified she considered the fragrances in fabric softeners and laundry detergents to be a problem [*id.*, Exhibit I at 115]. Plaintiff testified about a certain employee at the REC, stating she could not get within ten rows of computers without smelling what turned out to be the employee's fabric softener [*id.*].

Plaintiff acknowledged that fragrances are not the only trigger for her migraines [*id.*, Exhibit H at 107]. Plaintiff stated strong odors such as cleaning chemicals, pesticides, weather, and stress also trigger her migraines [*id.*]. She further stated that not every absence she has had from work is related to a migraine [*id.* at 133]. In addition, when asked, Plaintiff could not identify any particular fragrance which she finds particularly offensive [*id.*, Exhibit K at 32]. Plaintiff stated that whether a fragrance or odor affects her is "a trial and error thing." [*Id.*].

Plaintiff stated she wanted the REC management to enforce a fragrance ban by sending

"fragrant" employees home or by disciplining them up to, and including, removal [*id.*, Exhibit G at 102-03]. She testified she does not believe the supervisors who tell her that they cannot smell a fragrance on an employee when she claims to smell a fragrance [*id.* at 103-04]. Plaintiff further testified that no one, including Plaintiff herself, complains to the REC management when they smell fragrances on other employees because they think such complaints are useless [*id.* at 104].

Plaintiff stated the first time she recalled notifying the REC management of her objections to fragrances on the workroom floor was in 1998 [*id.*, Exhibit G at 76], although she complained about the smell involved in the re-tarring of the roof at the REC in 1995 [*id.* at 78]. According to Plaintiff, when she complains she detects a fragrance on another REC employee and a supervisor asks that employee if he or she is wearing anything with fragrances, "it happens all the time" that the employee denies they are wearing any fragrance [*id.* at 191]. Plaintiff states that on the occasions where the supervisor can smell a fragrance and questions the employee, that employee will claim to only have on lotion and that he or she will claim they only put on a little much earlier in the day [*id.*].

Plaintiff testified concerning one employee who had changed to a new fabric softener. Plaintiff testified she thought that employee was wearing perfume and that she "would have sworn on a stack of Bibles that it was perfume, . . .." [*Id.* at 192]. Plaintiff stated she started staying away from that employee [*id.* at 192-93].

During a migraine, Plaintiff has sensitivity to light and sound [*id.*, Exhibit 49 at 73]. She testified that the light from the computer monitors at the REC will exacerbate her migraine [*id.*]. Plaintiff further testified that when she has a migraine "some days all I can do is just go to bed turn out the lights, and turn off all the sound and just lay there . . . you pretty much can't do anything when you have a severe migraine . . .." [*Id.*]. Plaintiff also testified "I don't always miss work when

I have a migraine." [*Id.* at 77]. She stated that "[m]igraines vary in degree of intensity . . . You just get like a twinge or you just feel it coming on. You feel really bad because . . . I don't throw up but I get severe nausea with my migraines. . . But I have gone into work and like made it through some of the days, you know, with difficulty, but I do work with some of them." [*Id.*].

In addition, Plaintiff testified she thought there were more days when she had a migraine than when she did not have a migraine [*id.* at 77]. Plaintiff also testified she has difficulty concentrating or thinking when she has a migraine [*id.* at 116-17]. Plaintiff stated she has "a difficult time working" when she has a migraine because "[y]ou can't think, you can't concentrate, it's hard to . . . all you are thinking about and concentrating on is the throbbing in your head. You just can't focus." [*Id.* at 117]. During her November 2004 deposition testimony, Plaintiff stated the frequency of her migraines has increased [*id.*, Exhibit 10 at 104-05]. Plaintiff also stated the symptoms of her migraines had changed and that she was "getting light sensitivity, sound sensitivity. I'm starting to get lightheaded, I get dizzy. I kind of get disoriented on some.. . . Some have been so strong, I've gotten a sore throat from them . . .." [*Id.* at 105].

In addition, Plaintiff has also complained about the temperature at the REC, on the ground that heat also causes her to experience migraines.[5] Vickie Campbell ("Campbell"), a Tour 3 supervisor, testified the thermostat at the REC is kept at 68 to 70 degrees [Doc. No. 57, Exhibit 21 at 135]. Campbell stated she receives complaints about the temperature during Tour 3 about once a week [*id.*]. When Campbell receives a complaint, she has a technician check on the temperature and, if no technician is available, she checks on the temperature herself [*id.*]. Campbell stated the

---

[5] Although Plaintiff claims the heat in the REC also triggered her migraines in her summary judgment motion, there is no claim she was subject to excessive heat which caused migraines in her complaint [Doc. No. 1].

temperature throughout the REC is not constant because there are places where there is better airflow [*id.* at 136]. Campbell stated if Plaintiff, or another employee, needs to be cooler, she has them move to a location with better airflow [*id.* at 136]. Campbell also testified the air conditioning at the REC usually breaks about twice a summer [*id.*].

McCollum stated he receives frequent complaints about the temperature on the workroom floor – some employees complain they are too hot, others complain they are too cold [*id.*, Exhibit 20 at 44]. McCollum stated the temperature at the REC is kept in the low seventies and the thermostat will be turned down when it gets really hot outside [*id.* at 45]. McCollum stated the REC did have occasional problems with its air conditioning system because it is over ten years old [*id.* at 45].

Sharon Miller ("Miller"), another supervisor, testified the thermostat for the air conditioner was kept at 72 degrees [*id.*, Exhibit 18 at 208]. Miller stated when Plaintiff complained about the heat, she would move her to another site and also would try to adjust the temperature [*id.*].

Gertha Lee ("Lee") testified she has received complaints about the temperature at the REC [*id.* at 271]. Lee stated if the thermostat setting appears to be okay and other nearby employees do not complain they are too warm, the complaining employee is allowed to move to a cooler site [*id.*]. Lee stated if the other nearby employees also complain they are too warm, a technician is called to check the thermostat [*id.*].

### *i.* **Medical Reports**

A December 12, 2002 letter from Dr. Liezelle Jurgens states she is the primary care physician for Plaintiff and states Plaintiff "relates a medical history of perfume related migraine headaches, and for this reason it is my recommendation that accommodations be considered to allow her to work

within a fragrance-free environment." [Doc. No. 57, Exhibit 52]. A similar letter from Dr. Jurgens dated April 28, 2003, also appears in the record [*id.*, Exhibit 55].

Dr. Jurgens' deposition was taken on December 14, 2006 [*id.*, Exhibit 7]. During her deposition, Dr. Jurgens states that throughout her treatment of Plaintiff, Plaintiff consistently stated that fragrances and chemicals triggered her migraines and she had no reason to doubt Plaintiff's statements in that regard [*id.* at 26]. However, Dr. Jurgens acknowledged that other than Plaintiff's own statements that fragrances and chemicals triggered her migraines, she had no empirical data upon which such a conclusion could be based [*id.* at 29]. Dr. Jurgens further testified that allowing Plaintiff to work in a fragrance free environment would benefit Plaintiff, "if the migraines are truly triggered by the fragrances . . .." [*Id.* at 16-17].

Dr. Michael DeShazo, M.D., a specialist in neurology and a member of the American Headache Society, testified telephonically during the hearing before the ALJ [*id.*, Exhibit 10]. Dr. DeShazo estimated he had treated approximately ten thousand patients for headache related complaints over a 27-year period [*id.* at 52]. Dr. DeShazo testified he had reviewed numerous medical records concerning Plaintiff [*id.* at 53]. With regard to Plaintiff's fragrance sensitivity, Dr. DeShazo testified he had not seen a patient in his practice who was as sensitive to fragrances as Plaintiff [*id.*]. Dr. DeShazo testified:

> Many patients are very sensitive to fragrances, and there are certain ones, but she's probably the most sensitive person I think I've seen, at least in reviewing our records, it's very few people - - I don't think that anybody's ever reported fabric softener as triggering headaches. I suppose there may be one out there that could be more scented than the others.

[*Id.*].

### *ii.*      **Rule 35 Examination**

Pursuant to an agreed order granting Defendant's request for an independent medical examination under Fed. R. Civ. P. 35 [Doc. No. 19], Plaintiff was examined by Dr. Alan Hirsch on February 4, 2007, in connection with her migraine condition. Dr. Hirsch's report of his evaluation of Plaintiff states:

> The patient states that for most of her life, she has had no problems with odors, except for sensitivity to very strong smells. She states she routinely would use perfumes, as well as regular detergents.
>
> . . .
>
> Approximately six months after the auto accident in 1990, she slowly began to note that she was more sensitive to scents. Smells would bother her more. She was unable to wear perfume . . . odors caused her to have headaches . . . She states that perfume, such as Opium, or cigarette smoke, would cause her to develop headaches, dizziness, and lightheadedness, accompanied by palpitations and trouble thinking. She states that after five to ten minutes of exposure to odors, she would get a headache, photophobia, and sonophobia.
>
> . . .
>
> As the years progressed, less intense odors began to bother her. She states at work there are 700 people at arms-length away from each other . . . She state[d] then and even now she frequently misses work secondary to fragrance triggers of her headaches. She also occasionally experiences headaches which are triggered by weather. She states that last year she took more than twelve weeks off work secondary to migraines and low back pain.
>
> She states her odor sensitivity continued to worsen so that she was avoiding stores and would also avoid the baby and laundry aisles at grocery store. She is only able to go out to the mall approximately two times per year . . .. She continued to worsen to the current point of severity. It is so severe now that she is functionally disabled.. . . She states that this is affecting her life now in the sense that she only goes to work, home, and the doctor.
>
> . . .
>
> At work, her employers (the Post Office) would move her to sites with low smell. She finds she cannot go to the break room secondary to strong odors. When people wear AXE, the underarm spray, her symptoms become markedly worse. Odors that bother her now

include perfumes, scented lotions, cleaning chemicals, scented detergents, and her roommate's shampoo.
. . .
She states that after being exposed to a paint smell at work, she experienced symptoms which caused her to miss work for approximately one week. Even after one week when she returned to work, she could not sit near the walls. This lasted for approximately three weeks after the walls had been painted.

[Doc. No. 57, Exhibit 8 at 2-4].

Based upon a medical history, physical examination, cranial nerve examination, a range of motion examination, a motor examination, gait examination, cerebellar examination, sensory examination, reflex examination, chemosensory testing, and psychological testing, Dr. Hirsch's impression included: odor-induced migraine, rule out seizure (doubt); cacosmia; phantageusia; status-post motor vehicle accident with neck and low back pain; agoraphobia; depression; pseudohyperosmia (rule out adreocortical deficiency); partial hyposmia; atypical cephaliga with components of cervical radiculopathy, post-traumatic cephalgia, and migraine; dysgeusia (Topamax-induced); pseudohypergeusia; odor-induced multiple chemical sensitivity-like syndrome; ocular migraine; amigraneous migraine; vasomotor rhinitis; insomnia; bilateral S1 radiculopathy; right L5 radiculopathy; Post's pseudodementia versus mild cognitive impairment; and panic attacks. [*Id.* ].

Dr. Hirsch also stated:

This patient's disabling symptoms may very well be managed, including the odor-induced headaches and odor-induced other symptoms following with different medication approaches. A neurologist may be able to consider a trial of the following medications: Trileptal, Paxil, Protriplyne, Fluvoximine, Petadolex, or Prednisone, pending the results of the additional suggested tests.

While she is markedly bothered by her symptoms at the current time, working in a low odor environment temporarily and using medication to control her symptoms, would more likely than not, lead to a

marked reduction in her symptomatology and ability for her to return to work.

[*Id.* at 18].

In an addendum to his report, Dr. Hirsch responded that as a result of his testing he found evidence of an olfactory impairment [*id.* at 19]. When asked if this impairment substantially limited any of Plaintiff's major life activities, Dr. Hirsch responded:

> Yes it does. While she is able to walk, stand, sit[,] bend and breathe, she experiences difficulty in work situations in the presence of strong odors. She could work in another position such as data entry clerk or a situation without the presence of odors, or, after appropriate treatment, I believe that her symptoms will become much improved. With appropriate medication management, I feel she could probably work in the absence of the above-mentioned restrictions.

[*Id.*].

When asked what accommodations would allow Plaintiff to perform a data entry clerk position, Dr. Hirsch responded:

> If she could be in a room that would limit her exposure to strong odors in the environment and from her co-workers, this would allow her to function at a very high level.

[*Id.* at 20]. When asked what sensitivities he found to a reasonable degree of certainty and what types of medical restrictions Plaintiff's employer would have to abide in the workplace, Dr. Hirsch further responded:

> Her sensitivity would primarily be to solvents and other strong chemical odors. She would not be able to work in the presence of these strong odors, but other odors may also bother her as well including strong food odors, body odors, perfumes and the like. However, having said this, I would encourage her to work in environments without these and be able to work fine, but even more importantly, I believe appropriate treatment with medications will allow her to ultimately work even in the presence of these odors.

[*Id.*].  Dr. Hirsch stated that Plaintiff's:

> Medical restrictions . . . at this time would be such that she should work in a low-odor environment if at all possible.  Working in an area of high odor will make her symptoms much worse and will make it impossible for her to work.  These restrictions will not prevent future harm or aggravation, but rather, prevent her immediate effect.

[*Id.*].

With regard to Plaintiff's migraines, Dr. Hirsch stated:

> Migraines that she has do cause her to be intermittently incapacitated and when these headaches occur, forces her to lie down in the dark and miss work.  The most effective action the UPSP [sic] could do to prevent this incapacity, is (1) prevent her exposure to strong odors which induce her migraine. . ..
>
> Her current migraines are presently incapacitating to her, but I do not believe she should be disabled by her chemosensory problems or her migraines.. . . Without . . . intervention, in her current state, she would require substantial restrictions in terms of being in the presence of strong odors and would experience frequent headache which may require her to miss multiple work days.

[*Id.* at 21].

The transcript of the June 21, 2007 deposition of Dr. Hirsch appears in the record [Doc. No. 61-4].  Dr. Hirsch testified about the results of his examination of Plaintiff on February 4, 2007 [*id.* at 9], stating his examination of Plaintiff lasted "at least 12 hours, is my best recollection" [*id.* at 17].  Dr. Hirsch testified Plaintiff had odor induced migraines, which can be debilitating if they are severe [*id.* at 19, 21].

Dr. Hirsch testified Plaintiff also had multiple chemical sensitivity which he stated is:

> not accepted by the vast majority of the medical literature.  It's traditionally described as individuals who respond to odors or to low levels of chemicals, develop . . . symptomatology including not only headache, but dizziness, confusion, palpitations, desire to leave the environment – an overwhelming desire to leave the environment.

[*Id.* at 22].  Dr. Hirsch stated Plaintiff also had "[v]asomotor rhinitis . . . an abnormality whereby the nose will intermittently become very stuffed up." [*Id.* at 24].

Dr. Hirsch's opinion was that if Plaintiff could be kept in "an environment where the aesthethics are such that there's a very low level of ambient aroma, . . . she would be at a much better ability to work, . . . especially until her medications were given that would kick in to help reduce her symptoms." [*Id.* at 25].  With regard to an accommodation that would allow Plaintiff to be more successful in her work, Dr. Hirsch stated:

> there's two different ways of doing this.  The logical and easy approach would be to treat her with medication to try and get it better. The less logical, more challenging. . . approach would be to modify her environment so that she's not exposed to levels of odor.

[*Id.* at 28-29].

Dr. Hirsch further stated Plaintiff experiences "cacosmia" meaning "smell that otherwise should be interpreted hedonically as being very positive, as being a pleasant aroma, is interpreted by the individual as being horribly distorted and unpleasant." [*Id.* at 26].  With regard to the odors that bother Plaintiff, Dr. Hirsch stated:

> at the time I saw her, it was very clear that strong odors were the most bothersome to her, particularly the solvents, but even other strong odors. . . . an individual with odor-induced migraine headaches, if they perceive the odor is coming from a coworker they dislike, the odors are horrible and cause headaches.  On the other hand, when the person perceives the identical odor as coming from somebody they like or from another environment that's a positive one for them, the odor doesn't bother them. This is just part of the nature of the problem.

[*Id.* at 29-30].

Dr. Hirsch stated that minimizing strong odors like solvents, nail-polish odors, cigarette odors and strong food odors in Plaintiff's work environment "would have a positive impact on her

ability to work and reduce the headaches, but I would do this only as an adjunct to medical intervention." [*Id.* at 30]. Dr. Hirsch further testified that "while perfumes and colognes bother [Plaintiff] at work and sometimes bother her at home, the same perfumes and colognes in another environment may not bother her." [*Id.* at 32]. Dr. Hirsch stated that with aggressive medical intervention, he believed Plaintiff would have a high likelihood of recovery [*id.* at 33].

When asked if it would be difficult for a REC supervisor to detect the odors that bothered Plaintiff, Dr. Hirsch stated:

> Yeah, it would be. It would be impossible for them to know which ones are going to be perceived by her as being positive or negative. . . . It's hard, because in some individuals with – It's been described in the past that some individuals with odor-sensitive migraines, even the opening of a newspaper in the morning, an ink newspaper, is enough to induce them to have migraine headaches . . . one's olfactory ability varies depending upon the time of day, menstrual cycle, and also some other parameters, how hot and cold it is outside. So it would be very challenging.

[*Id.* at 36-37].

With regard to the REC, a facility with over 500 employees in one room, Dr. Hirsch testified that "[i]t's not possible to maintain something that's a fragrance-free environment. You can ask people to minimize the amount of perfume or cologne they wear; however, the smell is present anyhow, whether it be through underarm spray or any of other things. Even the strong smell of food may be enough to induce a problem." [*Id.* at 37-38]. Dr. Hirsch also stated this would be a problem in Plaintiff's case because not all of her migraines are caused by smells/odors [*id.* at 39].

With regard to modifying the environment in the REC to accommodate the Plaintiff, Dr. Hirsch stated such would not be possible because:

> [y]ou would have to either change the architecture such that you put her in a separate room with low odors or — to do that in a large open

room, you can try to do little things like move her away from one type of machinery or another. But when you're dealing with so many people and when she's bothered by so many different things, anything from cleaning lotions to scented lotions to scented detergents to scented shampoo, all of these can intermittently be bothersome to her and you'd almost have to have her either in a separate room or, preferably, give her medications that will help her so that the odors don't bother her.

[*Id.* at 39]. Dr. Hirsch stated:

Although you can encourage people to minimize their odor, it's going to be there whether you want it to or not.. . . I think it would be a reasonable accommodation for a work site to encourage people not to wear perfume and cologne, but the ideal approach is medical intervention.

[*Id.* at 42]. With regard to the success or ability of supervisors in the REC to control fragrances, Dr.

Hirsch stated:

I think it's very hard for management because people will do – on their own will do what they want to do. All management can do is encourage people to – or discourage people from using. . . high levels of odor. It's very hard to strictly enforce. . . . You can mandate enforcement under certain circumstances when people really know that it's going to be . . . if people are aware of the extent of the problem, like in the asthma unit or here . . .where people can't wear smells around or it impacts upon our testing. It's much harder in an environment where there's - - where there are so many people over many shifts and where so many different smells are affecting the individual.

[*Id.* at 54-55]. Finally, with regard to possible presence of strong fragrance wearers in the REC, Dr.

Hirsch testified:

The problem is, is that - - Well, there's several problems. The paint from the walls bother her, the smell from the food around. There's many - - Even just the smell of the Axe or the underarm smell is enough to bother her. So limiting the perfumes may help her a little bit. More likely than not, limiting the perfumes will just then redirect things that bother her to some other odors that are there that she now detects that she couldn't detect before because of the high levels of

the perfume or cologne.

[*Id.* at 58].

### *iii.* **FMLA Certifications**

Plaintiff testified that as of 2004, none of her doctors had heard of the Family and Medical Leave Act ("FMLA") [*id.*, Exhibit K at 140]. She stated, "I've never been to a doctor yet that has heard of the [FMLA]." [*Id.*]. Plaintiff testified she has had to explain the FMLA to each of her physicians and complete the FMLA forms for their signature [*id.*, Exhibit H at 135-36, 150, 207; Exhibit I at 86; Exhibit K at 226-27]. Plaintiff testified she would tell her doctors that she needed her FMLA forms "worded in a specific way" so she wrote them herself [*id.*, Exhibit H at 136]. Plaintiff also testified that "[t]he reason I typed them out was, from working in the medical profession. I know for a fact that doctors do not like paperwork." [*Id.*, Exhibit K at 139].

The FMLA certification concerning Plaintiff completed by Mary Chrostowski, M.D. dated August 30, 1999, stated the Plaintiff has migraine headaches [Doc. No. 57, Exhibit 1 at 1]. The FMLA certification stated that Plaintiff will be intermittently incapacitated by migraine headaches, and the incapacity "will be more frequent if the patient [is] exposed to triggers such as perfume and other strong odors." [*Id.*].

The FMLA certification concerning Plaintiff completed by Kellie Jolley, M.D. dated May 4, 2000, also stated that Plaintiff has migraine headaches [Doc. No. 57, Exhibit 2 at 1]. The certification indicates Plaintiff's impairment based upon migraine headaches will be intermittent and will be more frequent if she is exposed to triggers such as perfume [*id.*].

The additional FMLA certification concerning Plaintiff completed by Dr. Jolley dated May 7, 2001, also stated Plaintiff has intermittent migraine headaches [*id.*, Exhibit 3 at 1]. The

certification states Plaintiff's episodes of migraines will be more frequent if she is exposed to triggers, such as perfume, cleaning products, or other strong odors [*id.*].

### b.    Back Impairment

Plaintiff testified her back started hurting in 2001 and, since that time, she has had chronic, but not consistent, back pain [Doc. No. 43, Exhibit G at 114].  Plaintiff testified she has been able to control her back pain by epidurals, which she stated "have helped tremendously" [*id.* at 116-17].  Plaintiff testified she has been involved in four automobile accidents which injured the same area of her back [*id.* at 45-46].  Plaintiff testified that despite her back pain, she has continued to drive, go grocery shopping and do everything for herself [*id.* at 115].

Plaintiff's pain physician, Steven Dreskin, M.D., testified during his deposition of June 19, 2006, that Plaintiff's back "is able to function in a relative sense of doing her ordinary daily life functions." [*Id.*, Exhibit Q at 57].  Dr. Dreskin testified "Plaintiff has limitations and restrictions, but she's certainly not like some patients who have – which are completely nonfunctional and housebound." [*Id.*].  A report from Dr. Dreskin, dated November 11, 2002, diagnosed Plaintiff with L5-S1 disc protrusion with intermittent radiculopathy and stated that Plaintiff should avoid moving site to site and avoid repetitive bending [Doc. No. 57, Exhibit 34].

The FMLA certification signed by rheumatologist Charles Sienknecht, M.D. dated March 10, 2003, states that Plaintiff has L5, S1 disc protrusion with intermittent radiculopathy [Doc. No. 57, Exhibit 35 at 1].  Dr. Sienknecht stated that Plaintiff "may be unable to drive or have difficulty walking and/or bending." [*Id.* at 2].  Dr. Sienknecht also recommended that for a one-year period Plaintiff limit moving from site to site as much as possible, avoid repetitive bending, and avoid lifting two to five pounds repetitively [*id.*].

On November 11, 2002, Gregory White, M.D., submitted a report stating in pertinent part that Plaintiff was experiencing "[r]ight lower extremity radiculitis with central disc protrusion at L5-S1 [Doc. No. 43, Exhibit U at 2]. Dr. White also commented that at her request Plaintiff "was given a work restriction sheet to avoid moving site to site and to avoid repetitive bending." [*Id.*].

A report by Roger W. Catlin, M.D. dated August 4, 2003, states the physician's impression as: "[Plaintiff] report[s] low back pain, either of the sacroiliac, bilateral SI joint, or low lumbar facet joint arthropathy. Note: There is no indication that [Plaintiff] has true discogenic pain nor radiculopathy." [Doc. No. 43, Exhibit R at 4]. Dr. Catlin commented that Plaintiff's "pain diagram does not support a 'radicular pain.'" [*Id.* at 1]. Dr. Catlin also commented he was "having a difficult time putting [Plaintiff's] historical data together with her imaging studies, electrodiagnostic studies, psychological examination, current physical examination and her current claims of pain. The pieces do not fit a clinical picture. At best, on objective studies, [Plaintiff] has mild degenerative changes of the lumbar spine, specifically at L5-S1 and potentially at L2-L3." [*Id.* at 3]. Finally, Dr. Catlin stated:

> I do not see any evidence that any form of physical activity will be damaging to [Plaintiff]. Although she may claim and in fact experience some discomfort in function, physical activity, even at a moderate to significantly moderate level, should not be damaging for her, and in fact may be therapeutic.

[*Id.* at 5].

Pursuant to an agreed order granting Defendant's request for an independent medical examination by an orthopedic specialist under Fed. R. Civ. P. 35 [Doc. No. 20], Plaintiff was examined by Dr. W. H. King, Jr. on February 5, 2007 [Doc. No. 43, Exhibit S]. Dr. King's impression was chronic lumbosacral strain; mild degenerative disc disease L4-5 and L5-S1 [*id.* at

23

2].  Dr. King stated Plaintiff "is to have activity as tolerated" and:

> The [Plaintiff] should not be limited in her walking activities or
> breathing activities.  She may well be limited in sitting for long
> periods of time and certainly from bending and stooping frequently.
> The [Plaintiff] would not have limitation of duties in a light duty
> capacity, such as described as a data conversion operator.   An
> ergonomic work environment would be ideal . . .. She would also
> most probably benefit from the ability to change position as
> necessary.  These work accommodations would help her then [sic]
> further aggravation of her low back condition.

[*Id.*].

### 3.     Requested Accommodations

In a written request for reasonable accommodations dated November 21, 2002, Plaintiff
asked for the following accommodations: (1) a fragrance ban due to her "migraines and related
symptoms brought on by [her] **severe** sensitivities to fragrances;" (2) a limit on moving from site to
site within the REC as much as possible; namely, Plaintiff wanted "to be the *last* person moved out
of site when the mail volume is low due to severe pain caused by my L5, S1 disc protrusion"; and
(3) the air conditioner to be set at a reasonable temperature, 72 degrees [Doc. No. 57, Exhibit 11 at
1-2] (emphasis in original).

In her notes from a "reasonable accommodation teleconference" on January 8, 2003, Plaintiff
stated she told the reasonable accommodation committee that when she used the word fragrance:

> I told them I used this word because people were always thinking I
> was complaining about just perfume when in reality I was
> encompassing all products with smell – perfumes, scented lotions,
> detergents, cleaning chemicals, etc.  The same man asked exactly
> what accommodation I was asking for and I told him that if the
> perfumes were done away with, the lotions (and I told them both hand
> and body since many of the perfume manufacturers made lotions to
> correspond with their perfumes and to me, there was no difference
> between a perfumed body lotion and perfume) and the air freshener
> dispensers and hand sanitizer dispensers were done away with, that

should give me enough of a barrier removal in order to perform my
duties.

[*Id.*, Exhibit 24 at 3].

A committee evaluation form also dated January 28, 2003, states with regard to the

accommodations requested by Plaintiff:

> [Plaintiff] requested to be provided a fragrance-free environment.
> [Plaintiff] identified "fragrance" as colognes, hair products, air
> fresheners, sanitizers, cleaning solutions, laundry detergents, scented
> lotions, perfumes – anything with odor. She also requests that no
> cleaning be done while she is in the building, and that the supply door
> remain closed at all times. . . . [Plaintiff] also stated that moving site
> to site creates difficulties for her because she is required to bend at an
> odd angle to adjust her workstation up and down, and suggested that
> she be the last person to move. [Plaintiff] also requests that the
> thermostat be set at 72 degrees in the REC.

[*Id.*, Exhibit 25 at 2-3].

### 4.     Policy/Rule Against Excess Fragrance

Since about 1996, prior to the time Plaintiff began complaining about fragrances to the REC

management, the REC has had a policy/rule concerning fragrances [Doc. No. 43, Exhibit E at ¶ 8].

The REC General Rules and Regulations state in pertinent part:

> 32.     Employees that wear perfume, cologne and aftershave
> lotions and/or scented hand lotion must be considerate
> of other employees and wear lightly so as not to be
> offensive and cause illness to others in the workplace.

[Doc. No. 57, Exhibit 32].

There have been safety talks throughout the years at the REC to remind employees about the

rule concerning fragrances and new employees are told of the rule concerning fragrances when they

are hired [Doc. No. 43, Exhibit E at ¶ 9]. For example, a service talk from November 27, 1996,

includes the following: "Perfumes and Colognes. Please do not wear in concentrated forms. This

25

can also be unhealthy for people." [Doc. No. 57, Exhibit 28 at 1].  Further, an USPS routing slip

dated October 22, 1996, states:

> I'm sending this letter as a matter of policy for the [REC] in reference
> to perfume and cologne in the workplace.  You need to understand,
> as managers, that nowhere in the postal rules, regulations or safety
> regulations is it outlawed to wear fragrances.
>
> However, if you are able to identify a specific individual who is
> wearing heavy amounts of perfume or aftershave that is contributing
> to another employee's illness due to aroma, you can go to this
> individual and inform them of the unsafe conditions created in the
> workplace.  You can them have them remove the cologne and not
> have them wear it again to that degree.  If they fail to be receptive to
> your instructions, then you are able to take corrective action based on
> a safety issue.  This will have to be documented and substantiated.

[*Id.*, Exhibit 27].  A memorandum to all employees in the REC from the plant manager, also dated

October 22, 1996, states:

> I am requesting that all employees at the Chattanooga [REC] be
> considerate of co-workers in the wearing of perfume, cologne and
> aftershave that could be attributing to a negative impact on co-
> worker's health conditions due to illness, allergies and other
> sensitivities.  Your consideration will make a tremendous difference
> in the comfort level experienced by all in the workplace.
>
> If you must wear fragrances due to other commitments and
> professional environments, I will ask you be considerate and wear it
> lightly so as not to be offensive and cause illness to others in the
> workplace.

[Doc. No. 57, Exhibit 29].

A service talk dated January 28, 1997, includes the following: *"Perfumes and Colognes.*

*Please do not wear in concentrated forms.  This also can be a health-risk for some people, and that*

*makes it a safety hazard"* [Doc. No. 57, Exhibit 30].  Notes from the Safety and Heath Committee

meeting at the REC, dated March 3, 1997, state:

**Perfumes/Colognes/Lotions:** This continues to be a problem. Many of these prove to be offensive to other employees and prove to be an irritant for many allergy sufferers. If you encounter this problem, please go directly to your immediate supervisor and make him/her aware of the problem. The supervisor will then take the necessary steps to rectify the problem.

[Doc. No. 57, Exhibit 31 at ¶ 2]. The rule also is stated in the new employee materials for newly hired employees and is posted in the breakroom in the REC [Doc. No. 43, Exhibit E at 3, ¶ 9; Exhibit I at 141].

Considerable evidence about the REC's enforcement of its current policy/rule on the wearing of fragrances was adduced at the administrative hearing on this matter. McCollum testified he has been the manager of the REC since 1997 [Doc. No. 57, Exhibit 20 at 10]. McCollum stated that in addition to numerous talks to employees, he has frequently reminded supervisors that fragrances can cause problems [*id.* at 14]. McCollum stated the REC also disabled and eventually removed the air fresheners in the restroom [*id.*].

McCollum testified Plaintiff, and other persons with fragrance sensitivity, have been allowed to move when they want [*id.* at 15]. He further stated the REC has scheduled cleaning and use of pesticides/ bug spray outside of the Plaintiff's tour [*id.* at 15].

McCollum recalled a situation in which he received a complaint from either Plaintiff or Garvich about another employee. McCollum stated he and two other supervisors were working in close proximity to the other employee, but none of them were able to smell anything. McCollum stated the employee was asked if she were wearing a scent, and she denied she was wearing any scent [*id.* at 17].

With regard to Plaintiff's problem with fragrances, McCollum testified there had been a settlement with the Union at the REC based upon a grievance filed about the fragrance policy [*id.*

at 67].  McCollum said the settlement allowed Plaintiff (and others) the option to be able to move

anywhere in the REC where the mail volume permitted [*id.* at 67].  McCollum stated in addition:

> . . .we still continued to give safety talks and to make sure that they're
> aware of what's going on . . . all the things that we were doing . . .
> The supervisor's [sic] pretty much – it was done on – we all knew
> that [Plaintiff] was allowed to move, and then if possible, to try to
> move her last.  But it was up to the individual supervisors pretty
> much if they – how to handle somebody that they smelled a fragrance
> on.  I mean, I know people have been sent home.  People have went
> [sic] and washed it off, and then they've been told not to wear it,
> again, the fragrance.  I have told them recently that if you go up to a
> person, and in a general conversation with them, in close proximity,
> if you don't smell a fragrance, assume that they're wearing it lightly.
> But to go around smelling people three and four times, and bringing
> somebody over three or four times, I think it's being offensive to
> them.

[*id.* at 67-68].  McCollum acknowledged there had been no training to supervisory personnel

concerning the fragrance policy and he also acknowledged the fragrance policy is subjective [*id.* at

78, 80].

Amy Sentell ("Sentell") testified she has been employed at the REC since 1994 [Doc. No.

57, Exhibit 21 at 11].  Sentell stated she believed the policy concerning the wearing of fragrances

at the REC had changed from none to light wearing of fragrances [*id.* at 15].  Sentell stated she had

been bothered by fragrances at the REC about a dozen times or so [*id.* at 14].  Sentell stated,

however, she had not complained to management on those occasions [*id.* at 17].

Brion Peterson ("Peterson"), a DCO since January 1997, testified the policy at the REC was

to wear fragrances lightly [*id.* at 30-32].  Peterson testified he did not believe the policy was enforced

[*id.* at 33].  Peterson stated when he complained about a fragrance he was permitted to move [*id.*].

Peterson also stated he believes management generally disregards Plaintiff's complaints about

fragrances [*id.* at 34].

Rachel Gilliland ("Gilliland"), a DCO, testified she is sensitive to fragrances and has been overcome by the air freshener in the REC bathroom and also was affected by the smell of fragrances in the hall [*id.* at 69]. Gilliland testified she believed the REC policy as to fragrances had changed [*id.* at 71]. Gilliland also testified she believes the REC policy as to the light wearing of fragrances is not enforced [*id.* at 72]. Gilliland testified that she complained on one occasion about an employee who was then sent home [*id.* at 73-74]. Gilliland stated she also spoke with McCollum about the policy on fragrances [*id.* at 81]. Gilliland stated McCollum told her he was not going to tell someone they could not wear fragrances because he had been informed that would be violating their rights [*id.* at 81-82]. Gilliland admitted she could not recall a situation where someone in REC management told her they could not smell something where she believed they could [*id.* at 106].

Campbell, the previously identified 204B supervisor on Tour 3 at the REC, testified at the administrative hearing on this matter [*id.* at 126-27]. She stated she had about a dozen complaints about fragrances from employees at the REC [*id.* at 127]. Campbell stated when she received a complaint she would try to determine where the fragrance was coming from and if she could do so, she would tell the employee to wash, but if washing were not effective, she would send the employee home and tell them not to do it again [*id.*]. Campbell stated she had told employees to wash and had sent employees home if washing were not effective [*id.* at 127-28, 129]. Campbell stated that when she sent employees home they did not receive pay [*id.* at 128]. Campbell also stated there had been occasions when she received a complaint, but could not smell an odor/fragrance [*id.* at 128]. In that situation she would allow the complaining employee to move if that were possible [*id.*]. Campbell acknowledged there were occasions when Plaintiff complained about a fragrance, and she could not smell anything [*id.* at 132]. Campbell stated in that situation she would allow Plaintiff to move [*id.*].

Campbell also acknowledged she had not received any written document telling her how to enforce the REC's policy on fragrances [*id.* at 148-49].

Tammy Dixon ("Dixon"), a 204B Supervisor on Tour 3, also testified [Doc. No. 57, Exhibit 22 at 183-88]. At orientation classes, Dixon teaches employees not to wear any fragrance to such an extent that anyone who walks by you can smell it [*id.* at 187]. Dixon stated she tells employees if people can walk by them and smell the fragrance, they are wearing it too strongly [*id.*]. Dixon stated she had received complaints about fragrances on a couple of occasions [*id.* at 189]. Dixon stated she asked the person wearing the fragrance to wash it off and/or move [*id.*]. Dixon stated she would tell the person to wash off the fragrance if it was something they could wash off; however, she stated that if the fragrance was on their clothes and could not be washed off, the only recourse was to move the person offended by the fragrance [*id.* at 199]. Dixon stated if she had received a second complaint about that person, she would have sent them home [*id.* at 189]. Dixon stated she has told individuals to wash off a fragrance without receiving a complaint from another employee [*id.* at 191]. Dixon stated the REC takes attendance at the door, and if she detected a fragrance while taking attendance, she would tell that person to wash it off [*id.* at 200]. Dixon also stated there have been times when she received a complaint about a fragrance but could not smell anything [*id.* at 191].

Sandra Holland ("Holland"), who had been employed at the REC for about seven years, testified [Doc. No. 57, Exhibit 22 at 168-69]. Holland stated she had only complained about fragrances on one occasion [*id.* at 179]. Holland stated she asked if she could move because an employee near her had the strong scent of perfume [*id.*]. Holland was allowed to move as soon as the supervisor found another place for her [*id.*].

Rogers, another Tour 3 supervisor previously identified herein, testified the fragrance policy at the REC has always been to wear fragrances in moderation [Doc. No. 57, Exhibit 22 at 204-06]. Rogers stated the REC has never had a no fragrance policy [*id.*]. Rogers stated when she takes attendance and smells a fragrance on an employee, she takes that employee aside and asks them what they are wearing [*id.* at 209]. If it is something the employee can wash off, like hand lotion, Rogers tells the employee to go and wash it off [*id.*]. Rogers said she has never had an employee fail to comply with her orders [*id.*]. Rogers said she also tells the offending employee to find a product that is not so "smelly" or is unscented [*id.* at 210]. Rogers said if she continued to have a fragrance problem with that employee, she would send them home [*id.*].

Rogers also indicated there have been situations where she received a complaint about a fragrance, but could not smell anything [*id.* at 211-12]. In that situation, Rogers said the only alternative was to permit the complaining employee to move [*id.*]. Rogers admitted she had not received any formal training on how to enforce the fragrance policy [*id.* at 240]. Rogers said Plaintiff complains frequently about fragrances [*id.* at 212-13]. Rogers said she tried to investigate Plaintiff's complaints as soon as she received them [*id.* at 213-14]. Rogers also stated that on one occasion Plaintiff complained to her about an employee who had a sweat gland problem [*id.* at 223-24]. Plaintiff complained the employee had on too much cologne [*id.* at 223]. Rogers stated when she told the employee about his cologne, he told her about his sweat gland problem and stated he was wearing the cologne to avoid offending anyone [*id.* at 223-24]. Rogers said she explained the situation to the employee, and she never had any further problem with him [*id.* at 224]. Rogers also said she tried to explain the situation with the employee to Plaintiff, so that Plaintiff would not think he was wearing the cologne to try to aggravate her [*id.*].

Beverly Hunter ("Hunter"), another 204B Supervisor at the REC, testified the REC policy is that fragrances can be worn lightly so as not to disturb others [*id.* at 256]. Hunter said the policy has never changed, and employees are informed about the policy through safety talks [*id.*]. Hunter has received complaints about fragrances [*id.*]. She stated she either asks the person wearing the fragrance to wash it off or moves them to another site [*id.*]. Hunter did not recall ever having to send an employee home [*id.* at 256-57]. Hunter received complaints about fragrances from Plaintiff [*id.* at 257]. Hunter said if she could not smell a fragrance on the individual, she would either ask the individual to move or give Plaintiff the option to move [*id.*]. On most such occasions, Hunter stated the Plaintiff wanted the individual to move [*id.*]. Hunter stated there were occasions when Plaintiff complained, but she could not smell anything [*id.*]. Hunter said when she could not smell anything, there were occasions when she moved the person Plaintiff had complained about [*id.*].

Karen Whittle ("Whittle"), another Tour 3 supervisor, testified the REC policy is that fragrances should be worn lightly and considerately [*id.* at 268-69]. Whittle stated that when she receives a complaint about fragrances, if she can smell it, she moves the person with the fragrance away from the person complaining about the fragrance [*id.* at 269-70]. Whittle stated if the smell is excessive, she will direct the person to wash it off [*id.* at 270]. Whittle stated if washing it off was not successful, she would send the person home [*id.*]. Whittle estimated that in seven years she has sent home approximately four employees, and she has sent at least seven or eight to wash off fragrances [*id.*]. Whittle testified that she has never had a repeat problem with an employee she has sent to the washroom because of a fragrance [*id.*].

Whittle stated she had received complaints about fragrances from Plaintiff and on some of those occasions she did not smell a fragrance [*id.* at 271]. Whittle stated she did not have a very

keen sense of smell [*id.* at 270]. When Plaintiff complained and Whittle was able to smell something, she stated she immediately moved Plaintiff and then talked to the offending employee [*id.* at 271]. If Whittle was unable to smell something when Plaintiff complained she tried to "keep Plaintiff in a good place where she's not around a lot of people, so if it is a crowded place, I would move her away. Or, if it was not a crowded place, I would leave her and move – I tried not to embarrass either her or the person by talking to them in front of her, so I would wait until she was away." [*Id.*]

Robin Colloms ("Colloms") also testified [*id.* at 283]. Colloms has been working at the REC since it opened, she was a supervisor on Tour 3, but since 2002 she has been working on Tour 2 [*id.* at 284]. Colloms stated that Plaintiff probably complained to her about fragrances, although she stated she did not have a specific recollection of receiving a complaint from Plaintiff [*id.* at 289]. Colloms stated if Plaintiff complained to her, she would either move the person Plaintiff complained about or move Plaintiff [*id.* at 290]. Colloms also stated that when she was working as a Level 5 trainer at the REC, she never intentionally moved Plaintiff so that she would be near someone who was wearing a fragrance [*id.*]. Colloms also stated there were times when she received complaints about fragrances but could not smell anything [*id.*].

Patricia Lawhorn ("Lawhorn"), a group leader at the REC also testified [Doc. No. 57, Exhibit 22 at 306]. Lawhorn testified the policy at the REC was to wear fragrances lightly, and she stated the policy is stressed both at new employee orientation and in training [*id.* at 315-16]. Lawhorn was aware of employees who were sent to the washroom because of fragrances and also aware of REC employees who were sent home because of fragrances [*id.* at 316]. In particular, Lawhorn was aware of two people who were sent home because of fragrances [*id.* at 320]. When asked about an

employee who was sent home, Lawhorn stated she stood within four feet of the employee and never smelled "a thing." [*Id.* at 320-21].

Cathleen D. Lewis ("Lewis") a DCO on Tour 3, testified that on a few occasions she was aware of a fragrance being worn too strongly at the REC [*id.* at 29]. Lewis never complained to management in those situations, she simply moved [*id.* at 29, 31].

Miller, formerly a supervisor at the REC, testified the fragrance policy at the REC was to wear the fragrance lightly so as not to offend anyone [*id.* at 301]. Miller stated REC employees were notified of the policy at orientation and training and the policy was posted in the REC breakroom [*id.* at 201-02]. Miller stated she enforced the policy while she was a supervisor at the REC [*id.* at 202]. Miller said if someone complained about a fragrance, she would investigate, and if the employee were wearing a fragrance, they would be sent to wash it off, sent home or moved to a different place when possible [*id.*]. Miller estimated she sent employees to wash off fragrances approximately 25 or 30 times during the period she was a supervisor at the REC [*id.* at 202-03]. Miller also stated she could recall at least two employees she sent home because of fragrances [*id.* at 203]. Miller stated about once a month she received a complaint about a fragrance but smelled nothing [*id.* at 204]. Miller stated that if a specific employee was named, she would go and talk to that employee to see if she could smell anything [*id.*]. Miller stated if she could not smell anything, she would ask other supervisors to check [*id.* at 204].

Miller stated there were times she only received a complaint about a fragrance coming from a specific area, rather than a specific employee [*id.*]. Miller said sometimes she located an odor – which caused her to send the employee to the washroom, home or to key someplace else – and sometimes she did not locate an odor [*id.* at 204-05]. Miller also stated she never issued discipline

for fragrances because she only issued discipline when the problem occurred on more than one occasion [*id.*]. Miller stated she never encountered a repeat violation from an employee wearing fragrances [*id.*]. Miller further testified she never received any formal training concerning the issue of fragrances [*id.* at 231-32].

Lee, who is now a supervisor but has intermittently been the Acting Manager of Operations at the REC, testified there has never been a fragrance ban at the REC [*id.* at 260-61]. Lee testified the policy has always been to wear fragrances lightly so as not to offend or cause illness to other employees [*id.* at 261]. Lee stated Plaintiff did complain to her about fragrances [*id.* at 263]. When she received a complaint, Lee stated if she smelled an odor that was heavy, she would ask the employee to wash it off or to go and change [*id.*]. Lee stated if she did not smell anything, or if she smelled something but thought it was being worn lightly, she would allow Plaintiff to move out of the area [*id.*]. Lee also stated she had used other supervisors when she could not smell something [*id.* at 283-84]. Lee stated she had sent employees to the washroom, but she had never had to send an employee home because of a fragrance [*id.*]. Lee also stated there were times when she could not smell anything, but she either moved the employee or allowed Plaintiff to move [*id.*].

Lee did not  receive formal training as to the policy on fragrances, and she acknowledged it was sometimes difficult to determine the line between light and heavy fragrance [*id.* at 280]. Lee testified she thought it would be difficult to enforce a ban on fragrances because so many people wear fragrance and so many items contain fragrance, including deodorants, hair sprays, lotions, and fabric softeners [*id.* at 306-07].

Garvich testified the policy at the REC was that fragrances were to be worn lightly so as not to make others ill [*id.* at 13]. Garvich testified the policy used to be a fragrance ban [*id.*]. Garvich

testified she complained almost daily to a supervisor and told them that someone had on too much cologne or fragrance and she was told that if the supervisor could not smell anything they did not have to do anything about it [*id.* at 15]. Garvich stated REC management did not take Plaintiff's complaints seriously in her opinion [*id.* at 35]. Garvich also testified that the idea of sniffing someone to see if they were wearing scents, "just didn't seem right." [*id.* at 56].

Beate Ellis ("Ellis"), a DCO, testified there have been occasions when she believes colognes and perfumes were worn in the REC [*id.* at 71]. Ellis testified there have been occasions when she complained about fragrances [*id.*]. Ellis testified that once she complained, the fragrance problem was satisfied [*id.* at 74]. Ellis further testified there were standup talks about the fragrance problem [*id.*]. Ellis stated the fragrance problem at the REC has been getting better in her opinion [*id.*].

Jeris Cooper ("Cooper"), a DCO, testified that he has made complaints about fragrances to REC management [*id.* at 82]. Cooper stated there were times when he felt he did not receive a fair answer to his complaint from management [*id.* at 83]. Cooper stated those occasions were when he was told he could move [*id.*]. Cooper stated he felt it was unfair for him to move because he was there first [*id.*].

Dana Wheeler ("Wheeler"), a 204B supervisor at the REC, testified she was aware of the fragrance policy at the REC [*id.*, Exhibit 17 at 35]. Wheeler stated she has received complaints, but because of her duties, she frequently had to ask another supervisor to go out and check on the complaint [*id.* at 36]. Wheeler stated that on most occasions, she would try to move the person who was complaining because of a scent [*id.*]. Wheeler stated on two occasions she had sent employees to the washroom because a scent was too strong, but she never had to send anyone home [*id.* at 36-37]. Wheeler stated on both occasions where she sent an employee to wash, the employee was able

to wash off the scent [*id.* at 37]. Wheeler stated she never had a repeat problem concerning fragrances with either of those two employees [*id.*]. Wheeler testified she has never been given instructions on how to enforce the REC's fragrance policy [*id.* at 42]. Wheeler also stated she believed a no fragrance policy would not be enforceable [*id.*].

Michael Blansit ("Blansit"), a Tour 3 supervisor, testified the REC has a policy that fragrances can be worn but cannot be offensive to other people [*id.* at 77]. Blansit stated when he receives a complaint about a fragrance, he attempts to see if he can detect a smell [*id.* at 78]. He stated if he cannot detect a fragrance, he will get opinions from one or two other supervisors [*id.*]. Blansit stated if he smells something and is able to pinpoint the odor, he pulls the employee aside, reminds them of the policy, and may or may not ask them to wash up or go home [*id.* at 78-79]. Blansit stated he has not had to ask an employee to wash up or send them home [*id.* at 79]. Blansit also said he has never had a problem with a repeat offender concerning fragrances, because once he has asked an employee to change their use of fragrances, they have done so [*id.* at 80]. Blansit stated he received a complaint about an employee wearing too much fragrance, but he and two other supervisors walked over to where the employee was and none of them could smell anything [*id.* at 95].

Blansit also testified he had a problem with a no fragrance policy because he did not see how the USPS could prevent an employee from wearing a fragrance so long as it was not offensive to another employee [*id.* at 100]. Blansit further stated he believed a no fragrance policy would be a problem at the REC [*id.*]. Blansit stated the REC had a large number of employees who came to work directly from other jobs, where the decorum for that job may require that they wear a light fragrance [*id.*]. Blansit said many of these employees did not have time to go home and take a

shower or change clothes, so a no fragrance policy probably would be unreasonable as to those employees [*id.* at 100-01].

James Smith ("Smith"), a manager at the REC, testified the REC's policy is that fragrances should be worn lightly [*id.* at 144]. Smith testified the policy had not changed [*id.*]. Smith testified he has sent employees to wash off fragrances and sent them home in response to complaints [*id.* at 145]. Smith stated that when an employee gets sent home, they are not paid – "[t]hey hit the clock and they go home" [*id.*]. Smith stated when he receives a complaint, but cannot detect a scent, he gives the person who complained the option to move [*id.* at 146]. Smith testified he had a meeting with employees about fragrances [*id.* at 156]. Smith stated some employees may have thought they were wearing their cologne or perfume lightly, but they were wearing it heavily [*id.*]. Smith stated he continued to have meetings to encourage employees to wear less cologne, and he believed "it started to take [e]ffect" [*id.*].

Terri Spurgin ("Spurgin"), a DCO at the REC, testified telephonically during the administrative hearing in November 2004 [*id.*, Exhibit 14 at 61]. Spurgin testified she does encounter perfumes in the REC [*id.* at 70]. Specifically, Spurgin testified there is one employee whose perfume/cologne she smells everyday [*id.*]. Spurgin stated she also sees this individual in the presence of management, and she believes management should be able to smell the employee's perfume/cologne [*id.*].

Sharon Colbaugh ("Colbaugh"), a TE at the REC testified [*id.*, Exhibit 13 at 203]. Colbaugh was employed as a TE at the REC from August 1994 to June 2004 [*id.*]. Colbaugh stated when she first began working at the REC, there was a notice that no fragrances were allowed [*id.* at 208]. Colbaugh stated that later in time the policy progressed to the point that fragrances were to be kept

at a "very low, low, very low scent" [*id.* at 209]. Colbaugh stated there were several occasions when she had a problem with fragrances at the REC [*id.* at 206]. Colbaugh testified that when she said something about it to a supervisor, the supervisor asked her if she could point someone out and stated they did not have time to sniff it out [*id.*]. Colbaugh stated she was told she could move to wherever she wanted to [*id.*]. Colbaugh stated she made several complaints but "since they allowed me to move when I had a problem, then I just didn't say anything anymore" [*id.*]. Colbaugh also stated "they weren't really interested in trying to address the issue" [*id.*].

David Munger, Jr. ("Munger"), a former REC employee, also testified [*id.* at 220]. Munger stated he worked on both Tour 3 and Tour 2 [*id.* at 221]. Munger stated there were far fewer people on Tour 2 because the volume of mail was lower [*id.* at 222]. Munger stated he has migraines triggered by fragrances [*id.* at 223]. Munger stated he had a couple of situations where he had a physical reaction to fragrances in the environment [*id.* at 224]. Munger testified he experienced strong fragrances in the environment at the REC [*id.*].

Munger testified that at one time the REC had a fragrance ban, but at some point there was a loosening up of the policy to permit the light wearing of fragrances [*id.* at 227]. Munger stated in his opinion management did not enforce the light fragrance policy [*id.*]. Munger stated there were times when he pointed out a particular person to management, but management failed to take action [*id.* at 228]. Munger stated he had observed Plaintiff complain about fragrances [*id.* at 203-31]. Munger stated there was little response to Plaintiff's complaints [*id.*].

Plaintiff testified prior to the time McCollum became manager at the REC, she did not recall there being a specific policy as to fragrances at the REC [Doc. No. 43, Exhibit H at 124]. Plaintiff stated that after McCollum came "he was the one that instituted the fragrance ban, which was a ban

on perfume and scented hand and body lotions." [*Id.*].

### 5. Enforcement/Accommodations

#### a. Migraine/Fragrance

There is conflicting evidence regarding the adequacy of Defendant's efforts to enforce the light fragrance policy/rule. There is also a factual dispute regarding whether there was a fragrance ban at one time. The parties agree, however, that at least on occasion when the Defendant becomes aware that an employee is wearing a fragrance which is considered too strong, it has had the employee wash the fragrance off in the restroom, told the employee not to wear the fragrance so strongly again, moved the offending or offended employee, and, on rare occasion, sent the offending employee home to change clothes and to shower [*id.*, Exhibit E at ¶¶ 10, 11]. It is undisputed that Plaintiff has been allowed to move away from an employee she believes to be too fragrant as long as work is available at another workstation [*id.*].

Defendant's agreement to allow an employee, including Plaintiff, to move when he or she believes he or she has encountered a problematic smell/fragrance/odor was apparently memorialized in a settlement with the Union that represents employees at the REC [Doc. No. 57, Exhibit 18 at 32]. According to the testimony of one of the USPS managers, the settlement states:

> Those DCO's that have problems with scented products on the workroom floor, specifically perfumes and colognes will be accommodated in the following manner. . . . The employee will have an opportunity to move to another area of the workroom floor when mail images are available for productive keying.

[*Id.*].

REC supervisors work on a particular shift for long periods of time, know the employees on a particular shift, and also talk to other supervisors on the tour [*id.*, Exhibit K at 33-34]. For

example, supervisor Rogers has worked on Tour 3, the tour Plaintiff works, during the time period relevant to this action [*id.*]. While Plaintiff stated Rogers has been receptive to Plaintiff when she complained about fragrances, Plaintiff also testified she does not believe other supervisors when they claim not to smell any strong fragrance [*id.*, Exhibit I at 117; Exhibit K at 153]. Plaintiff testified she believes that fragrances are not worn lightly on a daily basis at the REC and that others should be able to smell such fragrances [*id.*, Exhibit K at 153]. Plaintiff testified the daily smell at the REC in 2001 as being as if one person "bathed in cologne multiplied by three hundred." [*Id.* at 162-63].

REC management offered Plaintiff masks for her face [*id.*, Exhibit E at 3, ¶ 12]. Plaintiff testified she thinks using a mask is too hot [*id.*, Exhibit I at 148; Exhibit K at 224; Exhibit G at 89]. Plaintiff has, however, performed her work with a tissue over her face [*id.*, Exhibit I at 148]. Plaintiff also testified she did not like the smell of one of the masks she was given to try [*id.* at 148-49].

In 2004, Plaintiff complained about the odor from painting being done at the REC [*id.*, Exhibit G at 96]. During the week in which the painting was being done, Plaintiff worked five hours [*id.*]. However, no painting was done on her tour, and the REC had requested a low odor paint [*id.*, Exhibit K at 36]. Plaintiff stated she wanted management to check with her before painting, even though no painting was done during her work hours, and she stated she did not necessarily feel that management needed to paint the REC facility [*id.* at 37].

Further, the REC also moved the air freshener in the restroom, raising it to a higher level, in response to complaints about it from Plaintiff [*id.*, Exhibit F at 108]. The REC also changed the scents used in the air freshener and eventually turned it off [*id.*, Exhibit K at 39-40]. During her deposition, Plaintiff testified it has been years since she made complaints concerning the air

freshener, but she claimed that was because management did nothing about her complaints [*id.* at 39].

The REC also changed the wipes it uses on its computer monitors after Plaintiff complained about the odor from the wipes it was using [*id.* at 44; Exhibit G at 90-91]. Further, Plaintiff's co-workers have occasionally brought in their own cleaning supplies because the computers are touched by so many people during the day. When Plaintiff complained about one employee who was bringing in Lysol to spray her computer keyboard, the supervisor told the employee to stop doing so, and the employee complied with the instruction [*id.*, Exhibit G at 92].

Defendant states stripping and waxing at the REC is done on holidays if possible [*id.*, Exhibit X-2 at 62]. Plaintiff has complained about the cleaning of carpet at the REC [*id.*, Exhibit K at 46]. On one occasion, a manager would not let solvent be used on the carpet during Plaintiff's tour [*id.*]. As a result, the carpet was steamed, and Plaintiff complained about the odor left by the wet carpet [*id.*]. On another occasion, workers were stripping the floors in the break room at the REC [*id.*, Exhibit G at 100]. Plaintiff testified she took her break in another room with a couple of people [*id.*]. Plaintiff stated she could not enter the breakroom to use the microwave so she missed lunch. Plaintiff was able to complete her tour on that day, but took the following day off for reasons unrelated to migraines [*id.* at 101].

After Plaintiff complained because some co-workers brought in their own bug spray after seeing bugs at work, management asked those individuals to stop; pesticides are not used on Plaintiff's Tour [*id.*, Exhibit K at 50-51]. Management also quit using Off bug spray [*id.*, Exhibit G at 97].

Plaintiff also complained about a co-worker who it was determined had a sweat gland

problem and was using fragrance for his problem [*id.*, Exhibit G at 194-95]. A REC supervisor talked to him and he agreed not to wear the fragrance [*id.*]. Plaintiff testified she stays away from this co-worker now [*id.* at 195]. Plaintiff states this employee continued to wear excessive amounts of cologne [Doc. No. 56 at 12, ¶ 93]. Another co-worker stays away from Plaintiff after management asked him to do so [*id.*, Exhibit H at 210; Exhibit W-1 at 91-92]. That co-worker did not know who Plaintiff was and was unaware he was being offensive to Plaintiff [*id.*, Exhibit W-1 at 91-92].

Plaintiff testified she moves at least twenty time per night because of fragrances at the REC [*id.*, Exhibit H at 118]. Plaintiff is aware of testimony by a doctor that out of approximately ten thousand patients, she is the rarest and most sensitive to fragrances he has ever seen [*id.*, Exhibit I at 115]. Plaintiff further testified that on the occasions when she complains about an allegedly fragrant employee and management does not smell a fragrance, management does not move the employee, but Plaintiff is allowed to move away from the allegedly fragrant employee [*id.* at 143]. Plaintiff acknowledged this means the fragrant sensitive REC employees are permitted to do something the other REC employees cannot do; namely, the fragrance sensitive employees are allowed to move when they assert they have encountered a fragrance, but the other REC employees cannot move [*id.* at 144].

Plaintiff admitted there are rare occasions when, after she identified a specific person, management located the person, smelled a fragrance, and told that person to go to the bathroom and wash off [Doc. No. 43, Exhibit I at 121]. Plaintiff further acknowledged that although she never witnessed the event, she is aware of persons who have been sent home without pay for wearing a fragrance [*id.* at 123]. Plaintiff also testified that if the REC managers detect or smell a fragrance on an employee, they ask the employee not to wear the scent or fragrance again [*id.*, Exhibit G at

193].  Plaintiff also admitted she is aware that some of the employees quit wearing the scent or fragrance when they are asked to do so by management [*id.* at 193-94].

Plaintiff testified she does not think she could do another job with the USPS, except, perhaps, a secretarial position [*id.*, Exhibit G at 137].  Plaintiff did not believe she could work at a post office because it would be impossible to control the scents being worn by customers [*id.*].

Plaintiff requested the thermostat in the REC be kept at 72 degrees because she asserts heat is also a trigger for her migraines.  McCollum states the REC "thermostat is ordinarily kept in the range of 72° F for the facility and at times lowered to allow for additional people in the building. However, due to its size, there are variations in the temperature depending on whether one is under a vent, close to the walls, etc." [*id.*, Exhibit E at 3, ¶ 13].

### b.      Back

Plaintiff has been offered a wheelchair for her back condition, which the REC rented for her and she never used [*id.*, Exhibit E at ¶ 12].  After the USPS rented the wheelchair but Plaintiff never used it for a month, Plaintiff asked for it [*id.*, Exhibit G at 126].  The wheelchair was not there and Plaintiff went home and was also out the next day [*id.* at 126-27].  When Plaintiff returned there was a wheelchair available [*id.* at 127].  Plaintiff stated she did not ask for a wheelchair again [*id.* at 130].

Plaintiff has also marked broken chairs, which have been fixed by the mechanics at the REC [*id.*, Exhibit G at 130-32].  On one occasion, Plaintiff fell while sitting in a chair [*id.*].  In his April 25, 2003 report of his examination, Dr. Catlin stated that Plaintiff reports "she was sitting at work, 03/28/03, when someone pushed down on the lever on her chair and she went to the floor." [*Id.*, Exhibit R at 1].  Dr. Catlin commented "[b]ased on the findings of her previous medical records and this examination, I think it is highly doubtful that [Plaintiff's] 'fall' while sitting in a chair, which

surely was hydraulic in function, was significant in creating physical damage, or even exacerbating previous physical damage" [*id.* at 4]. Another supervisor testified she is aware of Plaintiff's back problem and that she tries not to move her from site to site as much as other employees [*id.*, Exhibit W-1 at 33]. Further, another supervisor testified that on occasions when he had to move people out of a site because the volume of mail had dropped off for that location, he would allow Plaintiff to stay at that site and work there as long as the site remained active [*id.* at 89-90].

### 6.     Alleged Retaliation and Discrimination

Plaintiff also alleges she was retaliated and discriminated against when she was sent to a fitness for duty examination, she received a LOW, and she was not made a 204B supervisor.

### a.     Fitness for Duty Examination

Plaintiff was sent to a fitness for duty examination on July 17, 2001 [*id.*, Exhibit G at 137]. Plaintiff was paid for her time, and the examination was paid for by REC management [*id.* at 138]. Plaintiff's supervisor at that time, James Smith, told Plaintiff the purpose of the examination was to see if the REC was a safe place for Plaintiff to work [*id.* at 140].

Plaintiff admitted there was an escalation in the number of migraines she experienced in 2001 [*id.*, Exhibit F at 171]. Based upon Plaintiff's time sheets, which are attached to McCollum's declaration: (1) from May 2001 to December 2001, there were only four workweeks in which Plaintiff did not have at least one absence during the week; (2) in leave year 2002, there were only five workweeks in which Plaintiff did not have at least one absence during the workweek; and, (2) in leave year 2003, there were only three workweeks in which Plaintiff did not have at least one absence during the workweek [*id.*, Exhibit E, attachment 2].

The USPS Management Instruction on Fitness for Duty Examinations states:

The purpose of the Postal Service fitness-for-duty examination is to ascertain whether or not the employee is medically capable of meeting the requirements of his or her job.

[Doc. No. 43, Exhibit Y]. The management instruction also states:

Management may request a fitness-for-duty examination and repeat examinations as necessary to safeguard the employee and coworkers when there is concern about an employee's ability to perform his or her job, based on the observations of a supervisor, manager, or medical personnel.

[*Id.*]. Further, the manual states that:

A fitness for duty examination will be required when it is necessary to determine whether or not an employee is able to continue working or may return to his job after an absence due to illness or injury.

[Doc. No. 57, Exhibit 39].

The fitness for duty evaluation was performed by David Close, M.D. [*id.*, Exhibit 4]. Dr.

Close's report of the result of his examination states:

Migraine headaches, apparently triggered by cleaning solutions, perfumes and fragrances. My recommendation would be that all cleaning be done after she leaves work (this would give several hours before the building air purification system to remove such fumes). I would also recommend avoidance of perfumes, which may necessitate a ban on fragrances that the other employees would be wearing. Some of this may not need to take place if adequate prophylactic medications can be found.

[*Id.* at 1].

b.      **Letter of Warning**

Plaintiff has received only one LOW, and it was with no loss of pay [*id.*, Exhibit K at 26].

The LOW was issued on January 14, 2003, and states that "between November 21, 2002 and

December 27, 2002, [Plaintiff] . . . had seven unscheduled absences." [Doc. No. 57, Exhibit 51].

The LOW also gave Plaintiff notice she had the right to file a grievance within 14 days of the receipt

of the LOW [*id.*]. The LOW, received in 2003 for leave year 2002, was the first and only time Plaintiff depleted her FMLA-protected absences [*id.*, Exhibit K at 106-07; Exhibit W-2 at 214]. It was also the only year when Miller was in charge of Plaintiff's pay location [*id.*, Exhibit W-2 at 199].

Miller testified that the USPS policy is to be "regular in attendance," that unscheduled absences are considered to be not regular in attendance, and that, in deciding on discipline including Plaintiff's LOW, she did not consider absences that were FMLA protected [*id.*, Exhibit W-2 at 214-16]. Miller testified she had applied the rule concerning unscheduled absences to another employee who was not disabled [*id.* at 220-21].

The declaration of Miller dated June 6, 2004, also appears in the record [*id.*, Exhibit AA]. and states in pertinent part:

> I issued a [LOW] to [Plaintiff] for attendance on or about January 14, 2003. The unscheduled absences cited in the letter were not FMLA-protected.
>
> I have given other employees [LOWs] for attendance. I gave a [LOW] for attendance to Patricia Garvich for attendance in 2003. I gave a [LOW] for attendance to Bonnie Waller, a black female without any disability, in 1998. I have issued other [LOWs] to employees for other reasons as well.
>
> For a long time while I worked at the Chattanooga REC, I did not oversee any pay locations; therefore, I did not issue discipline.

[*Id.* at 1-2].

Plaintiff testified another REC employee, Joy Mayes, was treated more favorably than Plaintiff because she did not receive a LOW [*id.*, Exhibit G at 150]. In her declaration, Miller stated that she did not discipline Mayes when she reviewed the absences for 2002 in February 2003 because she "understood" Mayes' absences to be FMLA protected [*id.* at Exhibit AA at 2]. Miller testified

47

Mayes did not have the same number of unscheduled absences to warrant discipline as Plaintiff because Mayes absences were FMLA protected [Doc. No. 57, Exhibit 18 at 224].

Plaintiff testified her requests to be absent or leave work early have never been denied, except once in 1995 when she eventually was able to leave after complaining [Doc. No. 43, Exhibit G at 75-76]. Plaintiff also testified she has never been denied FMLA leave, except for those years in which she exhausted her 12-workweek entitlement for the leave year [*id.* at 75].

### c.      Acting 204B Supervisor Position

During the relevant time period, only two persons acted as 204B supervisors and "ran the system" on Tour 3, Dana Wheeler ("Wheeler") on weekdays and Lori Klecshka ("Klecshka") on the weekend [*id.*, Exhibit W-1 at 28; Exhibit X-2 at 38]. Klecshka occasionally fills in for Wheeler during the week [*id.*, Exhibit W-1 at 28; Exhibit X-2 at 43]. The supervisor, who runs the system on a regular basis, maximizes the work output at the REC by spreading out the images to the employees in the most effective way [*id.,* Exhibit W-1 at 19-28].

The 204B supervisor has to speak and interact directly with every employee arriving to work on Tour 3 and is constantly on her feet directing employees to move in a manner that will result in the least amount of disruption to the other DCOs [*id.*, Exhibit W-1 at 27-28]. During his deposition, McCollum testified that being employed in the 204B Supervisor position would require Plaintiff to interact closely and individually with the hundreds of employees at the REC and would result in Plaintiff's being on her feet for most of the day [*id.*, Exhibit X-2 at 41].

Although Plaintiff is sensitive to fragrances/odors/scents, she stated she believes she can hold her breath if she encounters another employee wearing fragrances [*id.*, Exhibit K at 116]. In her deposition, Plaintiff acknowledged that she is unable to stand on her feet for a very long period and

that management would have to do something about the wearing of fragrances for her to be able to do the job [*id.*, Exhibit G at 162-64].

McCollum stated that because of the specialized nature of the 204B Supervisor position and the limited number of persons at the REC with sufficient knowledge of the system who could fill-in when an unexpected absence occurs, regular and predictable attendance is necessary for the 204B Supervisor position [*id.*, Exhibit X-2 at 41-42]. McCollum stated that he did not think Plaintiff would be able to do the 204B Supervisor's position of running the system [*id.*].

### 7.   Additional Alleged Discrimination

Plaintiff also claims she was discriminated against when she was not retained as a level 5 trainer. In June 2002, the REC needed a level 5 trainer who would train newly hired REC employees how to key in flats – mail which was larger than a letter, such as a magazine [*id.*, Exhibit G at 165-68; Exhibit K at 85-87]. Plaintiff performed the level 5 trainer position for one night and then, after some time elapsed, worked as a level 5 trainer for about three weeks [*id.*]. During this period of time, she was on the workroom floor coaching an aisle of "keyers," *i.e.*, DCOs. Plaintiff picked trainees for her aisle that she believed were not fragrance wearers [*id.*, Exhibit G at 167-68]. When performing the level 5 trainer position, Plaintiff was required to be on her feet for "a good portion of [the time]," which she admits aggravated her back condition [*id.*, Exhibit G at 167]. Plaintiff admits that while working as a level 5 trainer, she physically held her back and walked slowly; however, she does not recall anyone speaking to her about her back [*id.*].

Plaintiff had received special training for the level 5 trainer position, and a level 5 trainer is expected to be present on a regular basis [*id.*, Exhibit K at 86; Exhibit W-2 at 273]. During the relevant time period, April through June 2002, Plaintiff was absent at least once a week [*id.*, Exhibit

K at 86-87]. During her deposition, the manager stated she did not continue to use Plaintiff as a level 5 trainer because Plaintiff was not regular in attendance and she was concerned that in the swift moving around entailed in the position, Plaintiff would either slip or twist quickly and further injure her back [*id.*, Exhibit W-2 at 273-74].

Further, a level 5 trainer job is a "bid" job, *i.e.*, employees at the REC "bid" on the job when there is a vacancy in the position [*id.*, Exhibit G at 171]. Plaintiff testified that she did not bid on a level 5 position in at least one instance because the REC was handling "flats," and due to the way the "flats" were arranged, there would have been a lot of running around, which she could not do [*id.* at 172]. There were some level 5 trainer positions on which no one "bid" [*id.* at 174]. Plaintiff testified she believes the difference in pay between her current position and a level 5 position is about 50 cents an hour [*id.*, Exhibit H at 200].

## III.    Analysis

### A.    Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-

moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

### B. Rehabilitation Act Claims

As noted, Plaintiff brought this action under the ADA. However, as an employee of the USPS, the Rehabilitation Act, not the ADA, applies as "the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (citing 42 U.S.C. § 12111(5)(B)(i) and cases). The fact that Plaintiff brought her claims under the ADA and not the Rehabilitation Act is not grounds for dismissal. In the Sixth Circuit, "[t]here is no significant difference between the substantive standards of the ADA and the Rehabilitation Act[;]" and her ADA claims are properly construed as Rehabilitations Act claims because "construing the ADA claim[s] as [] Rehabilitation Act claim[s] does not significantly alter the legal analysis" of the claims. *See Plautz v. Potter*, 156 F. App'x 812, 816 (6th Cir. Dec. 21, 2005) (*per curiam*).

The Rehabilitation Act provides in pertinent part:

> [n]o otherwise qualified individual with a disability . . . shall solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

*Id.* (quoting 29 U.S.C. § 794(a)). To recover under the Rehabilitation Act,

> a plaintiff must show that: 1) he is an individual with a disability; 2) he is "otherwise qualified" to perform the job requirements with or without reasonable accommodation; and (3) he was discharged or

51

> suffered an adverse employment action solely because of his
> disability.

*Id.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)); *accord Plautz*

156 F. App'x at 817. In the context of the Rehabilitation Act, which is a single-motivation statute,

an employee must prove she suffered the alleged adverse employment action *solely* by reason of her

disability. *Jones*, 488 F.3d at 409.

A disability under the Rehabilitation Act can be either a physical or mental impairment that

substantially limits the major life activities of an employee or being regarded as having such an

impairment by one's employer. *Todd v. City of Cincinnati*, 436 F.3d 635, 636 (6th Cir. 2006) (citing

42 U.S.C. § 12102 (2)). As the Sixth Circuit recently held, there are two ways to demonstrate that

an employer "regarded" an employee as disabled:

> (1) an employer must mistakenly believe that a person has a physical
> impairment that substantially limits one or more major life activities,
> or (2) an employer mistakenly believes that an actual, nonlimiting
> impairment substantially limits one or more major life activities. In
> both cases, it is necessary that the employer entertain misperceptions
> about the individual - it must believe either that one has a
> substantially limiting impairment that one does not have or that one
> has a substantially limiting impairment when, in fact, the impairment
> is not so limiting.

*Gentry v. Summit Behavioral Healthcare*, 197 F. App'x 434, 438 (6th Cir. 2006) (unpublished).

With respect to whether the impairment substantially limits the major life activities of an

employee, "a major life activity means 'functions such as caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Moorer v. Baptist*

*Memorial Health Care Sys.*, 398 F.3d 469, 479 (6th Cir. 2005) (quoting 29 C.F.R. § 1630.2(i)). A

plaintiff has the burden of establishing the existence of an impairment which substantially limits a

major life activity as an element of her *prima facie* case. *Monette*, 90 F.3d at 1181.

"When the major life activity under consideration is that of working, the statutory phrase, 'substantially limits' requires at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs or 'a broad range of jobs in various classes.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  An inability to perform "a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

In an action such as this one, where the Plaintiff was not terminated from her employment, she must establish she suffered an adverse employment action.  *Plautz*, 156 F. App'x at 817.  "An adverse employment action is a 'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'" *Id.* (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)).  Tangible employment actions of an employer which constitute a significant change in employment status include "hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* (quoting *Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

A plaintiff may meet her burden of proof by presenting direct or circumstantial evidence of unlawful disability discrimination.  Evidence is "direct" when "if believed, it would prove the fact in question without reliance on inference or presumption." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 76 F.3d 921, 926 (6th Cir.1999).

If a plaintiff establishes the elements of a *prima facie* case by presenting circumstantial, as opposed to direct, evidence, "the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (citing *McDonnell Douglas Corp. v. Green*, 411

53

U.S. 792, 802 (1973). If the defendant satisfies its burden of production, the plaintiff must then show by a preponderance of the evidence that "the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). A plaintiff can defeat summary judgment only if his or her evidence is sufficient to create a genuine and material dispute at each stage of the three-step, burden-shifting framework articulated in *McDonnell Douglas* as refined by *Burdine*.

In order to establish pretext, "a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)). In order to show that a jury could reasonably reject an employer's explanation, *i.e.*, to survive summary judgment, a plaintiff must show "by a preponderance of the evidence" the reasons proffered by the employer "(1) had no basis in fact, (2) did not actually motivate the employer's action or (3) that they were insufficient to motivate the employer's action." *Dews v. A. B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000) (citing *Manzer*, 29 F.3d at 1084).

The Rehabilitation Act "incorporates by reference § 12203(a) of the ADA, [which] provides in relevant part that [n]o person shall discriminate against an individual because such individual has opposed any act of practice made unlawful by this Act." *Plautz*, 156 F. App'x at 816 (quoting 29 U.S.C. § 794(a)). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action or harassment were causally connected. *Randolph v. Ohio Dep't of*

*Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006).

With respect to the third prong, not every act affecting an individual's employment is an adverse retaliatory action giving rise to liability. *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse which in this context means it might will have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington Northern and Santa Fe. Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2408 (2006)). In a very recent case, *Michael v. Caterpillar Financial Servs. Corp.*, ___ F.3d ___, 2007 WL 2176220, * 8 (6th Cir. 2007), the Sixth Circuit held that actions which are not materially adverse in the anti-discrimination context may qualify as materially adverse in the retaliation context. The Sixth Circuit noted that in the retaliation context, the plaintiff's burden of establishing an adverse employment action is a relatively low bar. *Id.*

To show a causal connection, *i.e.*, to establish the fourth prong of a *prima facie* case of retaliation, a plaintiff must adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken if the plaintiff had not engaged in protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984). There is no one dispositive factor required to establish a causal connection; however, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Id.*; *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). Where the time period between the protected activity and the adverse employment action is less than two

months, this may be sufficient. *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). However, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Balmer*, 423 F.3d at 615 (internal quotation omitted).

"The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Nguyen,* 229 F.3d at 563). If the plaintiff establishes a *prima facie* case of retaliation, the defendant may rebut the presumption of retaliation from the *prima facie* case by asserting a legitimate, non-discriminatory reason for its actions. *Balmer v. HCA, Inc.* 423 F.3d, 606, 614 (2005). The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for its adverse employment action was pretextual. *Id.* In order to show pretext, the employee must show the employer did not honestly believe the proffered reason for its adverse employment action. *Id.* To determine whether the employer had an "honest belief" in the proffered basis for its adverse employment action, the Sixth Circuit "looks to whether the employer can establish its 'reasonable reliance' on the particularized facts that were before [it] when the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1988). "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Thompson v. Potter*, No. C2-04-291, 2006 WL 783395, * 17 (S.D. Ohio March 27, 2006) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993)).

### 1. Alleged Disability from Migraine Headaches and Fragrance Sensitivity Impairment

The parties appear to agree that Plaintiff has impairments, but disagree whether the impairments constitute a disability under the law. Defendant asserts: (1) Plaintiff cannot prove her

migraine condition/fragrance sensitivity amounts to a "disability" as that term is defined by the Rehabilitation Act and (2) Defendant has provided a reasonable accommodation for Plaintiff's migraine condition/fragrance sensitivity [Doc. No. 42 at 34-40]. With regard to the assertion that Plaintiff's migraine condition/fragrance sensitivity is not a "disability" as defined by the Rehabilitation Act, Defendant states:

> Plaintiff has been working full time at the Postal Service since 1994 and received FMLA protection and paid leave (as earned) when she has migraines. During this time, she has been able to care for herself and her cats, living alone. Her only limitations have been going to church regularly, crowded restaurants, and having absences at this particular job, which is one that, by the nature of the job, required hundreds of people to work in a large room together at computer monitors.

[*Id.* at 35]. With regard to a reasonable accommodation, Defendant asserts the USPS

> has taken many, many steps to reduce strong fragrances in the workplace. There is a policy of wearing fragrances lightly. The supervisors investigate Plaintiff's, and her friend[s'], complaints of fragrances, by walking by the employee (or area if the employee is not identified). They try to smell the alleged strong fragrance and ask the employee(s) if anyone has on a fragrance. If there is a smell, the employee has been asked to wash off in the bathroom, and on at least one occasion since 1999, an employee was sent home to change clothes. If the supervisor does not smell anything and the challenged employee does not claim to have on a fragrance, such as lotion or cologne, then Plaintiff is allow [sic] to move to another seat where work is available.

[*Id.* at 38-39]. Further, Defendant asserts a complete fragrance ban or reconfiguration of the REC workplace is not objectively reasonable [*id.* at 40-42].

Plaintiff asserts she is an individual with a disability because she has recurrent fragrance and heat induced migraine headaches which substantially impair one or more of her major life activities and that Defendant has failed to reasonably accommodate her [Doc. No. 56 at 18-46].

It appears undisputed that Plaintiff has certain limitations related to her migraine headaches/fragrance sensitivity impairment. Merely having an impairment, however, does not make one disabled; a plaintiff must also show the impairment substantially limits a major life activity. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). The Court concludes Plaintiff has not shown she suffers from a physical or mental disability which substantially limits her major life activities such as caring for herself, hearing, speaking, breathing, learning, and working or that she has been regarded as having such a disability by Defendant. *See Todd*, 436 F.3d at 636; *Moorer*, 398 F.3d at 479.

Dr. Hirsch stated Plaintiff was able to "walk, stand, sit[,] bend and breathe." [Doc. No. 57, Exhibit 8 at 16-19]. While Dr. Hirsch testified Plaintiff "experiences difficulty in work situations in the presence of strong odors" and would not be able to work in the presence of these strong odors, he further stated Plaintiff's "[m]edical restrictions . . . at this time would be such that she should work in a low-odor environment if at all possible."[*Id.* at 19-20]. Dr. Hirsch opined the migraines "do cause her to be intermittently incapacitated" and to "lie down in the dark and miss work" when a migraine headache occurs [*id.* at 21]. Dr. Hirsch suggested the USPS should "prevent [Plaintiff's] exposure to strong odors which induce her migraine . . .." [*Id.*].

"Substantially limited" means "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Toyota*, 534 U.S. at 196 (quoting 29 C.F.R § 1630.2(j)). "In determining whether an individual is substantially limited in a major life activity, the regulations

instruct that the following factors should be considered: '[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment.'" *Id.* (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)).

Plaintiff argued her major life activities of seeing, thinking, concentrating, interacting with others, and working were substantially limited by her "recurrent" and "incapacitating" migraines. Plaintiff asserted that during a migraine she experienced light sensitivity, dizziness and nausea, and that she experienced migraines two-to-three times per week during the relevant time period. Focusing first on major life activities besides work, the evidence is not sufficient to enable a reasonable jury to find her impairments significantly restrict her ability to perform any particular major life activity.

Without dispute, seeing is considered a major life activity. *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 376 (6th Cir. 1997). Plaintiff testified that when she has a migraine, she has light sensitivity. She also testified that when she has a severe migraine she lies down and avoids light. Not all of her migraines are as severe because she testified she has worked with a migraine. In *McPherson v. Federal Express Corp.*, No. 06-5042, 2007 WL 2050853, * 3 (6th Cir. Jul. 13, 2007), the Plaintiff who suffered from diabetes, asserted his condition affected his major life activity of seeing. The Sixth Circuit found that the Plaintiff had not established any eye damage from his condition was severe, permanent or long term. *Id.* at *5. The Sixth Circuit also stated the Plaintiff had not demonstrated the Plaintiff "was unable to see relative to how well the general population can see or that he was "[s]ignificantly restricted as to the condition, manner or duration under which' he could see 'as compared to the condition, manner, or duration under which the average person in the

general population can' see." *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(i) - (ii)).

Although Plaintiff testified she experiences light sensitivity when she has a migraine, she has presented no evidence this light sensitivity has resulted in any permanent or temporary damage to her eyesight. In addition, it is not clear that light sensitivity is the same as an inability to see, particularly when interpreted in view of Plaintiff's testimony she has gone to work and has worked with a migraine and continues to care for herself. Thus, by Plaintiff's own admission, in some situations the light sensitivity stemming from Plaintiff's migraines does not limit Plaintiff's ability to see to the extent that it prevents her from working and the severity of her migraines fluctuates. Accordingly, Plaintiff has not shown her migraines have substantially limited her major life activity of seeing.

Concentrating is not considered a major life activity under the ADA. *See Boerst v. General Mills Operations*, *Inc.*, 25 F. App'x 403, 406 (6th Cir. 2002) (citing *Doren v. Battle Creek Health Care System*, 197 F.3d 595, 597 (6th Cir. 1999). In *Linser v. State of Ohio, Department of Mental Health*, No. 99-3887, 2000 WL 1529809 (6th Cir. Oct. 6, 2000) (quoting *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.), *cert. denied*, 528 U.S. 811 (1999), the Sixth Circuit rejected the plaintiff's contention her migraines limited her major life activity of concentration stating that "[c]oncentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity' itself."

Thinking, however, has been recognized as a major life activity by the Third Circuit. *Bennett v. Unisys Corp.*, No. 2:99CV0446, 2000 WL 33126583, * 4 (E.D. Pa. Dec. 11, 2000) (citing *Taylor v. Phoenixville Sch. Dist*, 184 F.3d 296, 306 (3rd Cir. 1999)). An individual is substantially limited in her ability to think if, "due to [an] impairment, she is significantly restricted as compared to the

average person in the general population." *Id.* at * 7.

Plaintiff testified she had difficulty concentrating or thinking when she had a migraine because she was concentrating or thinking about the throbbing in her head. Based upon this testimony, it appears Plaintiff's migraines interfere with her ability to think because she is distracted by the pain. Plaintiff admitted, however, that she had worked with a migraine. In those situation where Plaintiff worked despite having a migraine, the migraine likely resulted in her being less efficient or proficient than she would have been without experiencing pain. Plaintiff has presented no evidence, however, that her migraines substantially limited her ability to think compared to the average person in the general population.

The Sixth Circuit appears to recognize "interacting with others" as a major life activity. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir. 2002). "The activity of interacting with others is substantially limited only where an individual's relations are 'characterized on a regular basis by severe problems such as high levels of hostility, social withdrawal, or failure to communicate when necessary.'" *Bennett,* 2000 WL 33126583 at * 5 (quoting *Olson v. Dubuque Cmty. Sch. Dist.*, 137 F.3d 609, 612 (8th Cir. 1998)); *Jacques v. DiMarzio, Inc*., 200 F. Supp.2d 151, 161 (E.D.N.Y.,2002). While in February of 2007, Dr. Hirsch reported Plaintiff's condition had worsened and she currently could not participate in activities like dancing, going to clubs, church and generally, only went to work, home and the doctor [Doc. No. 57, Exhibit 8, at 3], Plaintiff has not presented evidence of a high level of hostility, social withdrawal or failure to communicate.

Under the evidence, if Plaintiff is substantially limited in any major life activity, it will be the activity of working. With respect to the major life activity of working, a plaintiff must "show an inability to work in a 'broad range of jobs,' rather than a specific job." *Id.* at 200. A plaintiff

must show that because of her impairment she has suffered a significant reduction in the number of meaningful employment opportunities which are available to her. *Maziarka v. Mills Fleet Farm Inc.*, 245 F.3d 675, 679 (8th Cir. 2001). Plaintiff has failed to meet this burden.

In *Mohr v. Hoover Co.*, 97 F. App'x 620, 621 (6th Cir. May 14, 2004), the plaintiff, who was transferred to another position in her company, brought suit against her employer alleging the transfer was based on disability discrimination due to her Type II diabetes, and also was in retaliation for her filing a complaint against her employer. Addressing the major life activity of working, the *Mohr* court noted that the only specific job plaintiff's employer regarded her as unqualified to perform was that of forklift operator, which the Sixth Circuit stated was "a far cry from being 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.'" *Id.* at 623 (quoting 29 C. F. R. § 1630.2(j)(3)(i)). Specifically, the Sixth Circuit stated that as the record showed only that *Mohr* was unable to perform a single, particular job, it "does not constitute a substantial limitation in the major life activity of working." *Id.*

In *Mohr,* the plaintiff not only contended she was disabled but also that her employer regarded her as such. *Id.* In order to show she was regarded as disabled, a plaintiff must show that her employer "mistakenly believe[d] that [her] actual, nonlimiting impairment substantially limits one or more major life activities." *Id.* (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S.516, 521-22 (1999)). The *Mohr* court found that plaintiff's employer did not regard her as disabled because it invited her to bid on different jobs. *Id.* at 624.

In her brief, Plaintiff cites two out-of-circuit district court cases, *Hendry v. GTE North, Inc.*, 896 F. Supp. 816, 824 (N.D. Ind. 1995) and *Dutton v. Johnson County Bd. of County Comm'rs*, 859 F. Supp. 498, 506 (D. Kan. 1994), for the proposition that migraines can constitute an impairment

under the ADA [Doc. No. 56 at 20]. In both case cases, the respective district court addressed whether the terminated-employee-plaintiff's migraine headaches constituted a disability with respect to the major life activity of working. Both courts agreed the status of being a disabled individual was "a highly fact-sensitive issue, requiring an individualized inquiry and case-by-case determination." *Hendry*, 896 F. Supp. at 824 (quoting *Dutton* 859 F. Supp. at 506). In *Hendry*, the court found a question of fact as to whether the plaintiff was limited in the major life activity of working as a result of daily migraines, but did not directly address whether the plaintiff had shown an inability to work in a broad range of jobs or a significant reduction in the number of meaningful employment opportunities. *Id.* In *Dutton*, the court found a question of fact as to whether the plaintiff was limited in the major life activity of working after finding there was no evidence to connect plaintiff's headaches to a particular type of work. 859 F. Supp. at 506. Neither case supports finding a genuine issue of material fact here.

In *Williams v. Stark County Bd. of County Comm'rs*, 7 F. App'x 441, 443 (6th Cir. 2001), the plaintiff, who suffered from migraine headaches and hypertension, requested a demotion to a less stressful job. *Id.* at 444. After being reassigned, the plaintiff was eventually terminated. *Id.* The Sixth Circuit concluded the plaintiff's migraines were an impairment based upon the opinion of a migraine specialist that plaintiff was unable to work during a migraine attack. *Id.* at 447. The Sixth Circuit concluded, however, that the plaintiff's request for a demotion undermined her physician's opinion and suggested she could perform certain jobs, just not the job she was terminated from. *Id.* The Sixth Circuit stated that "[a]t most [the plaintiff] ha[d] shown her condition (migraines) made it difficult for her to perform her particular job." *Id.* Further, the Sixth Circuit held that because Plaintiff had failed to allege or provide evidence that her claimed disability disqualified her from a

broad class of jobs, she had not shown she was substantially limited in the major life activity of working. *Id.*

In a very recent case cited by Defendant, *Thomas v. Avon Products, Inc.*, No. 1:05-cv-794, 2007 WL 1796011, * 3 (S. D. Ohio June 20, 2007) (slip copy), the court found the plaintiff's intermittent migraines did not substantially limit the major life activity of working. The court found the plaintiff was only limited when she had a migraine, the plaintiff's migraines were not frequent as they occurred only two to three times per year, and plaintiff could limit the frequency of her migraines by avoiding chemical fumes. *Id.* at * 5. It is undisputed that Plaintiff's migraines occur more frequently than was the case in *Thomas*, but Plaintiff's headaches have not resulted in her termination from her employment at the REC. It also appears Plaintiff could limit her migraines if she did not work Tour 3 in the REC with more than 500 other employees.

Plaintiff has testified she does not believe she could work at a post office or in jobs where she had to work directly with the public because there would be no way to limit the fragrances worn by the public, but she has failed to set forth evidence that she cannot perform either a class of jobs or a broad range of jobs in various classes. To the contrary, the medical evidence indicates Plaintiff could reduce her migraines and flagrance sensitivity by working in an environment where she would not be exposed to strong odors and multiple co-workers.

Additionally, although Plaintiff has alleged Defendant considered her disabled when it denied her the 204B and level 5 positions, the record shows that she was permitted to bid on the 204B position and also was permitted to work in the level 5 trainer position for a period of about three weeks. Plaintiff also worked in the 204 B position for about two weeks before the decision was made to award the position to Wheeler. In both instances, the Defendant decided not to place

Plaintiff permanently in those positions after encountering problems with her performance in those positions, particularly her unscheduled absences. Thus, Plaintiff has not shown the Defendant mistakenly regarded her as being precluded from performing either a class of jobs or a broad range of jobs in various classes. Further, assuming *arguendo* that the fact the Defendant decided not to permanently award the 204B supervisor and level 5 positions to Plaintiff shows that Plaintiff is precluded from performing those two particular jobs, such a showing does not show she is unable to either perform a class of jobs or a broad range of jobs in various classes. *Mohr,* 97 F. App'x at 621.

Plaintiff testified her migraines are unpredictable and occur at different times of the day or week and that fragrances/strong odors are not the only trigger for her migraines as weather, heat and stress also trigger her migraines [Doc. No. 43, Exhibit G at 67, Exhibit H at 107].[6] As noted, Dr. Hirsch indicated Plaintiff should work in a low-odor environment [Doc. No. 57, Exhibit 8 at 18]. Dr. Hirsch stated Plaintiff's odor sensitivity would primarily be to solvents and other strong chemical odors [*id.* at 20]. Even viewing this in the light most favorable to Plaintiff, it does not amount to evidence that she cannot perform either a class of jobs or a broad range of jobs.

An impairment that disqualifies an individual from a narrow range of jobs is not a substantially limiting impairment. *Wainscott v. Medusa Aggregates Co.*, No. 98-5562, 1999 WL 196561, * 3 (6th Cir. April 1. 1999), *cert. denied*, 528 U.S. 869 (1999) (quoting *McKay*, 110 F.3d at 372. Thus, even giving Plaintiff the benefit of all reasonable inferences, the most the evidence shows is that she may be unable to work in particular jobs at the REC and the narrow range of jobs

---

[6] Plaintiff also admitted that not all of her absences from work are migraine related [Doc. No. 43, Exhibit H at 133].

described by Dr. Hirsch. Plaintiff relies upon *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 253 (6th Cir. 2000), in which the Sixth Circuit found the district court properly concluded the plaintiff was disabled, *i.e.*, substantially limited in his major life activities, where his injury precluded him from performing at least 50% of the jobs he was qualified to perform given his educational background and experience. The evidence before this Court does not rise to that level. *See also Williams*, 7 F. App'x at 443; *Thomas*, 2007 WL 1796011 at * 5. In fact, Plaintiff presented no vocational evidence to indicate she cannot perform jobs she is qualified to do. While Plaintiff experiences difficulties working with more than 500 employees in a large room at the REC, she has not shown she is precluded from performing jobs in other environments.

Accordingly, Plaintiff has failed to meet her burden of establishing her migraine headache/fragrance sensitivity impairment constitutes a disability under the Rehabilitation Act.

### 2. Reasonable Accommodation for Migraines

Defendant asserts even if Plaintiff suffers from a "disability" under the Rehabilitation Act, it has offered Plaintiff a reasonable accommodation for her migraines caused by fragrance sensitivity [Doc. No. 43 at 37]. Plaintiff, on the other hand, asserts Defendant has not offered her a reasonable accommodation. Specifically, Plaintiff asserts she:

> has proposed the accommodation of a fragrance free environment under which colognes, perfumes and scented lotions would be banned. However, she has also proposed a less restrictive measure under which the Postal Service would actually enforce the existing fragrance policy, including extending discipline to offenders. The plaintiff has also indicated she would accept segregations [sic] from the general workforce. She has also requested to be moved as little as possible, that cleaning not be performed on her shift, to be allowed to have a small personal fan with her, and for the deodorizers to be removed from the restroom.

[Doc. No. 56 at 23-24] (internal citations omitted). Plaintiff asserts the aforementioned

accommodations "are necessary, reasonable, and not an undue hardship for the agency." [*Id.*].

"Reasonable accommodation may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.'" *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 728 (6th Cir. 2000) (quoting 42 U.S.C. § 12111(9)(B)). The Sixth Circuit has explained that "[w]hen the employee seeks a reasonable accommodation, she must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation. If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Id.* (quoting *Monette*, 90 F.3d at 1186 n. 12).

A plaintiff has the initial burden of proposing an accommodation and showing it is objectively reasonable. *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 857 (6th Cir. Mar. 14, 2002). Once the employee has proposed an objectively reasonable accommodation, the employer has the burden of persuasion on whether that accommodation would impose an undue hardship on the employer. *Id.* However, "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hoskins*, 227 F.3d at 728 n.3 (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)).

Plaintiff's request for either segregation, a fragrance-free REC, or a more strictly enforced light fragrance environment is not objectively reasonable under the circumstances. In *Montenez-Denman v. Slater*, No. 98-4426, 2000 WL 263279, * 2 (6th Cir. Mar. 1, 2000), the plaintiff, who

worked for the FAA as an air traffic control specialist, requested a fragrance free environment based upon a letter from her physician recommending the elimination of perfume or smoke around the plaintiff. *Id.* at * 1. The district court found that a fragrance free environment was not a reasonable accommodation under the Rehabilitation Act stating:

> affording [plaintiff] a "fragrance-free" work environment still purports to require her employer to engage in the undue burden of establishing and enforcing a prohibition against "scents." This imposes an obligation on her employer to prohibit plaintiff's co-workers and those who occasionally come into the office of their right to wear "scents," to engage in the burdensome and unseemly task of enforcing such a prohibition and to identify and rid plaintiff's workplace of many other common scent producing agents such as cleaning supplies . . . nothing in the Rehabilitation Act suggests that Congress intended for the Act to extend an employer's obligation as far as plaintiff urges.

*Id.* at * 2. The Sixth Circuit upheld the district court's conclusion stating:

> It would be impractical and virtually impossible for the FAA to enforce the accommodation requested by [plaintiff]. Clearly, the accommodation is not objectively reasonable.

*Id.* at * 3.

In *Kaufman v. GMAC Mortgage Corp.*, No 04-cv-5671, 2006 WL 1371185, * 4 (E.D. Pa. May 17, 2006), the plaintiff, who had allergic rhinitis and asthma exacerbated by exposure to strong orders and perfumes, brought suit under the ADA. In pertinent part, the plaintiff asserted the zero-tolerance policy adopted by the defendant and the numerous e-mails to co-workers about the policy did not constitute a reasonable accommodation. *Id.* at * 12. The plaintiff characterized the defendant's actions to enforce the policy as "half-hearted" and contended she should have been permitted to work from home because she continued to have allergic reactions despite the zero-tolerance policy. *Id.* The *Kaufman* court stated:

The use of the word "reasonable" as an adjective for the word "accommodate" connotes that an employer is not required to accommodate an employee in any manner in which that employee desires. The term "reasonable," as it is employed in the ADA, would have no meaning if employers were required to provide employees the maximum accommodation or every conceivable accommodation possible.

*Id.* at * 13.

The *Kaufman* court further stated:

Clearly, what [p]laintiff was demanding here was a completely scent-free environment to be policed by her supervisors and enforced with disciplinary punishments. To require [defendant] to enforce this type of accommodation would be to impose undue financial and administrative burdens. It would not only be impractical, it would be virtually impossible. . ..

Defendant took reasonable steps to accommodate [plaintiff] in this case and to help her avoid the irritants that caused her allergic reactions. Plaintiff's supervisors sent e-mails requesting that employees refrain from using scents and then instituted a complete no-fragrance policy. They twice moved Plaintiff's desk to more secluded areas, . . . there is only so much avoidance that can be done before an employer would essentially be providing a bubble for an employee.. . . the additional accommodation sought by Plaintiff, an enforcement of the no-fragrance policy with respect to all visitors . . . and by disciplinary measures against GMAC employees, would impose "an undue financial [and] administrative burden" on GMAC.

*Id.*

In *Hunt v. St. Peter School*, 963 F. Supp. 843, (W.D. Mo. 1997), the plaintiff brought an action against the defendant, a private parochial school, demanding a mandatory scent-free environment for her minor child while she attended the school. *Id.* at 846-47. The plaintiff's daughter suffered from asthma, which her doctor identified as life threatening. *Id.* at 850. The defendant implemented a voluntary scent-free classroom for the plaintiff's daughter, but it refused to provide a mandatory scent-free environment throughout the school on the ground officials

believed it was not possible to enforce such a scent-free environment and such a mandatory plan would conflict with the rights of its students and teachers. *Id.* at 848. The *Hunt* court found that a mandatory scent-free policy would be burdensome and unworkable. *Id.* at 852. In pertinent part, the court stated:

> [p]laintiffs also argue the burden of a mandatory policy would not be great because the voluntary policy had not been a problem . . .. Plaintiffs . . . fail to recognize that a mandatory rule is often resisted more vigorously than a voluntary policy. In a society inclined to protect rights rather than acknowledge responsibility, a confrontation is more likely to occur when a student or parent is told that they cannot wear scents than when they are educated and given the freedom to be thoughtful to a classmate. Indeed, as students mature and enter adolescence, their interests in scents grow geometrically, making it increasingly difficult to maintain a voluntary or a mandatory scent-free environment.

> Plaintiffs attempt to minimize the foregoing concerns by pointing to the dress code policy at St. Peter, and they suggest that it would be a simple matter to add scents to the things which the students could not wear. The fallacy in the argument is that a violation of the dress code is quickly apparent. Scents are more personal and would require a closer inspection than would be comfortable for either the administrator or the interloper. Sniffing may be appropriate in the wild kingdom, but not in an elementary school.. . . Finally, scents come from numerous sources, not just from people. There are scents in deodorants, shampoos, hair conditioners, perfumes, laundry detergent, hair spray, makeup and breath fresheners. There are also scents in cleaning supplies, food . . . paint . . .. The variety of products producing scents, the number of people who would be affected by a mandatory policy, and the personal nature of inspection to detect violations, all make a scent-free environment substantially more burdensome to enforce than a dress code. . ..

> A mandatory policy also limits the choices of the non-disabled population.. . . In an employment setting, courts have found that "[a]n employer is not required to make accommodations that would violate the rights of other employees." *Wooten*, 58 F.3d at 386 (citing *Mason v. Frank*, 32 F.3d 315, 319 (8th Cir. 1994)).. . . The purpose of the Rehabilitation Act of 1973 is to prevent discrimination against disabled persons and, if necessary, to add things to the environment

> to permit greater participation by the disabled – elevators, bathrooms,
> signs, more time on examinations for the learning disabled, flexible
> work schedules for the mentally ill, etc. There is nothing in the Act
> to suggest that the non-disabled population was expected to give up
> or substantially alter their lifestyle.

*Id.* at 852-53.

Dr. Hirsch talked about the difficulty associated with enforcing a total ban on fragrances. The difficulty in this instance would be compounded by the number of employees at the REC and the fact that the REC has a number of temporary or transitional employees who come to work at the REC directly from other employment, where it may be appropriate for them to wear fragrances. Based upon the foregoing, Plaintiff has not met her initial burden of proposing the accommodation of a fragrance ban at the REC is objectively reasonable. *See Coulson*, 31 F. App'x at 857.

Likewise, Plaintiff has not shown segregation is a reasonable option. Even if she could show segregation was objectively reasonable, she does not dispute that DCOs must move from site to site throughout the REC as mail volume at particular sites increases or decreases. In accommodating individuals, an employer is not required to shift essential job functions onto others. *Hoskins*, 227 F.3d at 729. An employer is also not required to make an overall change in the way its conducts business in order to accommodate an employee. *Heaser v. Toro Company*, 247 F.2d 826, 832 (8th Cir. 2001). Thus, the Defendant has met its burden of establishing that segregating Plaintiff would impose an undue hardship on it. *Id.*

Much of the parties' argument and evidence focuses on the light fragrance policy and its enforcement. There is conflicting testimony regarding whether the Defendant vigorously and adequately enforces the light fragrance policy. It is undisputed, however, that the REC is a large open room in which Plaintiff comes into contact with as many as 500 other employees per day and

that Plaintiff is allowed to move if she is bothered by a fragrance. The evidence is also undisputed that the policy/rule to wear light fragrance is posted in the REC breakroom, service talks are given on this policy, and new hires at the REC are given an orientation that includes the fragrance policy.

Further, although Plaintiff contends the REC has not sufficiently enforced its policy about wearing fragrances lightly, a number of REC supervisors have testified that when they receive complaints about a fragrance and are able to detect a smell, they have required employees to wash off the fragrance and, on much more limited occasions, have sent an employee home without pay. Plaintiff asserts she does not believe the REC supervisors when they say that cannot smell something in response to one of her complaints, but Dr. Hirsch testified that actually detecting a smell complained about by Plaintiff may be difficult for the REC supervisors given the nature of Plaintiff's olfactory complaints and her heightened and subjective sensitivity. As Dr. Hirsch stated in his uncontradicted testimony, "while perfumes and colognes bother her at work and sometimes bother her at home, the same perfumes and colognes in another environment may not bother her." [Doc. No. 61-4 at 29-30].

Plaintiff claims she voluntarily moves "upwards of twenty times" per tour due to being accosted by fragrances [Doc. No. 43, Exhibit H at 118]. REC supervisors testified that when Plaintiff complains, even if they are unable to detect a smell, they permit Plaintiff to move since there is little else they can do in that situation. Plaintiff presented the testimony of several co-workers who opined the REC supervisors did not appear to be interested in responding to Plaintiff's complaints. It is Dr. Hirsch's undisputed testimony, however, that the REC supervisors would not be able to perceive odors in the same manner that Plaintiff perceives them. Given the large number of odors in the REC to which Plaintiff reacts and the twenty times per tour she reacts to fragrances,

it is not surprising that the REC supervisors often do not detect an odor about which Plaintiff complains.

In addition, while Plaintiff argues it would be satisfactory if the REC simply enforced its light fragrance policy as to the wearing of perfumes, colognes and hand lotions, at least once when she complained she was actually reacting to a co-worker's fabric softener. Dr. Hirsch also testified that if perfumes and colognes were removed from the Plaintiff's environment, this would only change the substance to which she was reacting, not the fact she was reacting to an odor or substance.

Further, having to approach and smell employees to determine if they are wearing a scent or fragrance that is not "light" is no doubt as uncomfortable for the supervisor as it is for the allegedly offending employee. The evidence, and particularly Dr. Hirsch's undisputed testimony, suggests that even if the Defendant had been more successful in enforcing its policy on the light wearing of fragrances, this would not have had a significant impact on Plaintiff's fragrance sensitivity. Dr. Hirsch's uncontradicted opinion is in the absence of medication even if the Defendant had managed to persuade its employees to not wear any perfumes, colognes or scented hand lotions, Plaintiff would react to some other odor in the environment.[7] Thus, the factual dispute regarding enforcement of the light fragrance policy is not material to Plaintiff's impairment.

Accordingly, that aspect of Defendant's motion for a summary judgment on Plaintiff's claim Defendant was required to, but failed to, reasonably accommodate Plaintiff's migraine

---

[7] The record shows Defendant, to the extent practical, limits cleaning of carpets on Plaintiff's tour, uses low odor paint, has disabled the air fresheners in the restrooms, limits use solvents on Plaintiff's tour, limits pesticide spraying on Plaintiff's tour, limits use of cleaning wipes on computer monitors, and has also told employees they could not bring in their own cleaning products, such as Lysol spray, which cause a problem for Plaintiff. While Plaintiff complained about an incident when the floor in the employee break room was being "stripped" during her tour, she was able to work that tour and did not work the next day for reasons unrelated to a migraine headache.

impairment/fragrance sensitivity during the relevant period [Doc. No. 41] will be **GRANTED**.

### 3.    Alleged Disability from Back Impairment

Defendant also asserts Plaintiff cannot prove her back condition is a disability which substantially limits her in a major life activity [Doc. No. 42 at 41]. Defendant also asserts moving from work station to work station is an essential part of Plaintiff's job [*id.*].

Plaintiff asserts Defendant was required to and failed to reasonably accommodate Plaintiff's back condition during the period from May 2001 through November 2004 [Doc. No. 56 at 46]. Plaintiff further asserts she has an impairment, disc protrusion and intermittent radiculopathy, which constitutes a disability because it substantially limits her daily activities [*id.* at 46-49]. Plaintiff asserts the USPS failed to accommodate Plaintiff's back condition because it moved her frequently during a typical shift [*id.* at 50-51].

Plaintiff has been in four automobile accidents which resulted in injury to her back [Doc. No. 43, Exhibit G at 45-46]. Dr. Dreskin diagnosed Plaintiff with L5-S1 disc protrusion with intermittent radiculopathy and stated she should avoid moving site to site and avoid repetitive bending [Doc. No. 57, Exhibit 34]. However, during his deposition, Dr. Dreskin testified Plaintiff's back was able to function in a relative sense of doing ordinary daily life functions and that Plaintiff was not non-functional or housebound, although she had restrictions [Doc. No. 43, Exhibit Q at 57]. In an FMLA certification of March 10, 2003, Dr. Sienknecht recommended that for a one-year period, Plaintiff limit moving from site to site as much as possible, avoid repetitive bending, and avoid lifting two to five pounds repetitively [Doc. No. 57, Exhibit 35 at 2]. Dr. Catlin stated he did not see evidence physical activity would be damaging to Plaintiff and, that at a moderate to significantly moderate level, may be therapeutic for Plaintiff [Doc. No. 43, Exhibit R at 5]. Finally,

when Dr. King examined the Plaintiff in February 2007, he opined Plaintiff would not be limited in walking or breathing activities, although she may be limited in sitting for long periods of time and from frequent bending and stooping [Doc. No. 43, Exhibit S at 2].

Moreover, despite back impairment, Plaintiff testified she continues to drive, go grocery shopping and do everything for herself [*id.*, Exhibit G at 115]. She also said there were times when she could barely walk and it was difficult to dress herself, clean, and cook due to her back pain [Doc. No. 57, Exhibit 10 at 158-161]. She described these times as a new onset [*id.*]. She stated there were times when she was fine and then experienced problems with her back [*id.* at 157-58]. During the November 2004 hearing, Plaintiff also stated she had recently received a prescription for the use of a cane [*id.* at 166-67].

As noted above, major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *McMahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002). The Sixth Circuit has held the terms substantially limits and major life activities "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* (quoting *Toyota*, 534 U.S. at 197).

"[A]ny impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the [Rehabilitation] Act. *Id.* at 590-91 (citing *Williams*, 534 U.S. at 197-98). "'S]ignificantly limits' requires a showing of considerable limitation or one that limits a major life activity 'to a large degree.'" *Agnew v. Heat Treating Servs. of Am.*, No. 04-2531, 2005 WL 3440432, * 4 (6th Cir. Dec. 14, 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1991)). "Temporary physical conditions, even those that may possibly recur, do not generally constitute substantial impairments." *Id.* (citing *Plant*

*v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000)).

In *Agnew*, the plaintiff had a bad back which "at times prevent[ed] him from lifting heavy objects, bending at the waist, twisting, standing for long period of time, or walking long distances, but . . . failed to establish that his back injury preclude[d] him from performing these activities altogether or that he's significantly restricted in performing these activities." *Id.* at * 5. The Sixth Circuit stated that, at best, the plaintiff had "shown that he has an injury that at times limits his ability to perform major life activities such as walking or performing manual tasks, but [plaintiff] ha[d] not shown that he is substantially limited in his ability to perform a major life activity." *Id.* Likewise, in this case Plaintiff has presented, at best, evidence that her back impairment at times limited or interfered with her ability to walk, cook and clean, but Plaintiff is able to care for herself.

With regard to Plaintiff's use of a cane, there is no evidence whether Plaintiff requires the cane at all times or only when her back condition has an onset or flare up. Moreover, based upon her testimony, it does not appear Plaintiff used a cane at the time of any of the events complained about in this action. Thus, the mere fact Plaintiff was prescribed the use of a cane is insufficient to create a genuine issue of material fact as to whether her back condition substantially limited her major life activity of walking. *See Ballo v. Adecco*, No. Civ. A. 05-5734, 2006 WL 1876569, * 8 (E.D. Pa. Jul. 5, 2006). *See also Penchishen v. Stroh Brewery Co.*, 932 F. Supp. 671, 673-75 (E.D. Pa. 1996), *aff'd*, 116 F.3d 469 (3rd. Cir. 1997), *cert. denied*, 522 U.S. 868 (1997) (plaintiff, who after an automobile accident could walk at only half her normal speed*,* was not substantially limited in the major life activity of walking).

As with her migraine impairment, Plaintiff has submitted no evidence that she is substantially limited in any major life activity as a result of her back impairment or her impairments in

combination. *See Moorer*, 398 F.3d at 479.  Further, with regard to the major life activity of working, Plaintiff has presented no evidence that she is unable to work in a broad class of jobs or "a broad range of jobs in various classes."  *Gentry*, 197 F. App'x at 438.

Accordingly, Plaintiff has failed to meet her burden of establishing her back impairment constitutes a disability under the Rehabilitation Act.  In addition, after considering Plaintiff's impairments in combination, Plaintiff has failed to meet her burden of establishing her impairments constitute a disability under the Rehabilitation Act.

### 4.    Reasonable Accommodations for Back

Further, assuming *arguendo,* Plaintiff's back impairment did substantially limit a major life activity, Defendant has reasonably accommodated her impairment.

Dr. Sienknecht's FMLA certification states Plaintiff should be limited in moving from site to site as much as possible [Doc. No. 57, Exhibit 35 at 2].  As noted, Plaintiff asserts the USPS failed to accommodate Plaintiff's back condition because it moved her frequently during a typical shift [Doc. No. 56 at 50-51].

The evidence shows that REC supervisors try not to move Plaintiff but move her when work on other computers is needed [Doc. No. 43, Exhibit G at 122].  The supervisors also try to limit the number of times the Plaintiff is moved because this may aggravate her back condition [*id.*].  With regard to Plaintiff's back condition, McCollum testified:

> we were going to move [Plaintiff] last if we could; a lot of times you can't do that, we need everybody to move.  But if we were moving people out of their sites, we would let her be one of the last ones to move.

[Doc. No. 57, Exhibit 20 at 57].

The record also shows that when Plaintiff complains about a fragrance, but the REC

supervisors are unable to detect any fragrance or scent, Plaintiff is permitted to move away from the allegedly fragrant employee [*id.,* Exhibit I at 143]. Plaintiff has testified she moved approximately twenty times per tour due to fragrances. Thus, although Plaintiff complains she is moved frequently, it appears Plaintiff frequently moves voluntarily after being exposed to a undesirable fragrance.

Nevertheless, the evidence shows that because images from particular mail processing plants are sent to particular computers on the work room floor, moving from site to site in the REC is an essential function of the DCO position at the REC [Doc. No. 43, Exhibit H at 117, Exhibit F at 182-90]. As noted above, in accommodating individuals, an employer is not required to shift essential job functions onto others, *Hoskins*, 227 F.3d at 729, and is also not required to make an overall change in the way its conducts business in order to accommodate an employee, *Heaser* 247 F.2d at 832.

Accordingly, I conclude Defendant has established there is no genuine issue of material fact as to this issue. Therefore, that aspect of Defendant's summary judgment motion which seeks summary judgment on Plaintiff's claims that Defendant was required to and failed to reasonably accommodate Plaintiff's back condition during the relevant period [Doc. No. 41] will be **GRANTED**.

### 5.    Alleged Disability Discrimination and Retaliation

#### a.    Fitness for Duty Examination

Defendant asserts it did not engage in disability discrimination or retaliation against Plaintiff for any protected activity when it sent her for a fitness for duty medical examination on July 17, 2001 [Doc. No. 42 at 42-43]. Defendant asserts it had a legitimate, non-discriminatory reason for requesting the medical examination [*id.*]. Specifically, Defendant asserts "it requested an

independent medical examination in response to Plaintiff's growing complaints that work-related fragrances were causing injury to her so that [it] would be able to respond in an informed manner." [Doc. No. 42 at 44].

Plaintiff asserts the USPS engaged in retaliation when it sent her for a fitness for duty examination, approximately one month after she filed a complaint with the EEOC [Doc. No. 56 at 51-52]. Plaintiff also asserts the fitness for duty examination was an adverse job action [*id.* at 52-55]. Plaintiff states only she and one other person who also filed an EEOC charge were sent for such examinations even though others complained about fragrances [*id.*].

With regard to a fitness for duty examination, the Sixth Circuit has stated:

> We adopt this qualification for a fitness-for-duty examination, acknowledging it is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance. While it is true that the ADA limits an employer's ability to request unfounded examinations to prevent "the unwanted exposure of the employee's disability and the stigma it may carry," an employer may order a well-founded examination.

*Sullivan v. River Valley School Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) (quoting *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 n. 8 (6th Cir. 1998)).

An adverse employment action is a materially adverse change in the terms or conditions of the plaintiff's employment caused by the employer's actions. *Stone v. Board of Directors of Tennessee Valley Authority*, 35 F. App'x 193, 199 (6th Cir. 2002). The material change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Hollins v. Alt. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). The material change "may be indicated by termination, demotion through a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Id.* A "*de minimis* employment [action]" does not constitute a materially adverse employment action. *Id.* (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). "Not everything that makes an employee unhappy is an adverse employment action." *Id.* at 200. Where there is no evidence that a fitness for duty examination affects the terms and conditions of a plaintiff's employment, a fitness for duty examination does not constitute an adverse employment action. *Id.* at 199-200.

It has been held that merely mandating a fitness for duty examination does not constitute an adverse employment action. *Schoonover v. Schneider Nat. Carriers, Inc.*, ___ F. Supp. 2d ___, 2007 WL 1828885, * 20 (S.D. Iowa 2007). The Sixth Circuit has held where there is no evidence that a fitness for duty examination affected the terms and conditions of a plaintiff's employment, the fitness for duty examination is not an adverse employment action. *Stone*, 35 F. App'x at 200 (6th Cir. May 15, 2002). *See also Giang v. Potter*, 369 F. Supp.2d 763, 769 (E.D. Va. 2005) (no adverse employment action where employee remains in same position, at same grade and same salary while submitting for fitness for duty examination).

In *Murry v. Gonzales*, No. 504-CV-498-OC-10GRJ, 2006 WL 2506963, * 9 (M.D. Fla. Aug. 28, 2006), however, the court found that the fitness for duty examinations at issue arguably constituted adverse employment actions. The plaintiff in *Murry* was required to undergo physical and mental fitness examinations after filing an EEOC complaint. *Id.* at * 10. Prior to the fitness examinations, plaintiff was transferred and, although her job title, work hours and compensation did not change, the plaintiff did not have the same job duties, did not supervise employees and did not have the same level of job responsibility in the position to which she was transferred. *Id.* Moreover, the plaintiff presented evidence the position to which she was transferred had a stigma associated

with it, namely that her employer only transferred problem employees to work there. *Id.* Further, the plaintiff was no longer eligible to work overtime in the position to which she was transferred. *Id.*

The district court in *Murry* found that the two fitness for duty examinations the plaintiff was forced to undergo were "inextricably intertwined" with the plaintiff's transfer to another position. *Id.* First, plaintiff's employer admitted the transfer was done "pending" the fitness for duty examinations and that the plaintiff would not be transferred back until she successfully passed both the physical and mental fitness for duty examinations. *Id.* The district court also found there was "a clear stigma" associated with the fitness for duty examinations the plaintiff was forced to undergo because she had never demonstrated any physical inability to perform her job, only her emotional and/or mental state was under question at the time she was forced to undergo the examinations. *Id.* The *Murry* court found that under such circumstances, being forced to undergo the fitness for duty examinations "might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern*, 126 S. Ct. at 2415). The situation in this instance is clearly distinguishable.

Smith, Plaintiff's supervisor at the time, testified the reason a fitness for duty examination was proposed was the Plaintiff's migraines [Doc. No. 57, Exhibit 17 at 165-66]. Although not clear, the idea for the examination may have originated with Smith's supervisor, Tina Player ("Player") [*id.* at 164]. Smith acknowledged Plaintiff's performance as a "keyer" was excellent, and he testified a fitness for duty examination was necessary because of the frequency of the migraines and related attendance issues [*id.* at 165].

With regard to her conversation with Smith, Plaintiff testified that he told her he was sending

her for the fitness for duty examination because he noticed an escalation in her absences [*id.*, Exhibit 49 at 54]. Plaintiff stated she did not think she should have been sent for the fitness for duty examination "because I was still entitled to those 12 weeks under FMLA." [*Id.*]. Plaintiff also admitted she did "not know if I had been gone any more than I had the previous years. They never gave me a comparison." [*Id.*].

Plaintiff argues the inconsistent testimony of Player proves Smith was aware that Plaintiff had filed an EEOC complaint prior to the time he suggested the fitness for duty examination. Player testified that as early as September 1999, she and McCollum had begun a discussion of sending Plaintiff for a fitness for duty examination [Doc. No. 57, Exhibit 19 at 8 ]. Player stated she knew of Plaintiff's filing of an EEOC complaint prior to the final approval of the fitness for duty examination [*id.*]. However, Player only testified Smith "probably" knew about the EEOC complaint because he was Plaintiff's supervisor [*id.* at 9].

McCollum testified he approved sending Plaintiff for a fitness for duty examination [*id.*, Exhibit 20 at 47]. McCollum stated he could not remember what was written on the form for the fitness for duty examination; however, he stated he thought it was appropriate to send Plaintiff for an examination "[b]ecause of the increase in the absenteeism, and it was becoming more and more common. And that's one of the things, that the absenteeism increased, and you can ask somebody to go for a Fitness for Duty." [*Id.* at 56-57]. However, on June 18, 2001, Player sent an e-mail to McCollum which stated in pertinent part:

> You have the request for the FFDs. When you approve, please return and I will submit to our Occupational Nurse to complete the process. Both employees have filed EEO complaints and want a fragrance free work environment.

[Doc. No. 57, Exhibit 37 at 1].

Prior to the fitness for duty examination, Plaintiff was not transferred to another position and did not have a change in pay or grade at the USPS. Moreover, Plaintiff was paid for her time during the fitness for duty examination and the USPS paid for the fitness for duty examination. Plaintiff has claimed no adverse consequences stemming from the results of the fitness for duty examination, and she was neither transferred to another position nor did she suffer any change in grade or salary. Moreover, the examination related only to the medical issue at hand, Plaintiff's absences allegedly due to fragrance induced migraines. There is no evidence in the record the fitness for duty examination was conducted in any significantly different manner than other fitness for duty examinations, *i.e.*, it was not an unduly long examination which resulted in Plaintiff being absent from work for a number of days. Further, the evidence also shows the REC management did have the authority to request a fitness for duty examination under the USPS policy.

Plaintiff's has not demonstrated the examination was materiality adverse as it relates to her claim of disability discrimination. In light of the relatively low threshold for adverse employment actions in a retaliation context, however, Plaintiff may establish a *prima facie* case of retaliation based upon the fitness for duty examination. Defendant has, however, articulated a legitimate non-discriminatory reason for the fitness for duty examination, namely that it was in response to Plaintiff's absences and her complaints that her absences were caused by migraines resulting from work related exposure to fragrances.

In her May 11, 2001 EEOC complaint, Plaintiff requested as an accommodation, *inter alia*, a "[f]ragrance ban instituted immediately [and] enforced [with] consequences for violators." [Doc. No. 43, Exhibit A-1 2]. This request for a fragrance ban at the REC with progressive discipline goes far beyond the REC's policy requiring the light wearing of fragrances. "[H]ealth problems that

significantly affect an employee's performance of essential job functions justify ordering a physical examination "'even if the examination might disclose whether the employee is disabled or the extent of any disability.'" *Sullivan*,197 F.3d at 812 (quoting *Yin v. State of California,* 95 F.3d 864, 868 (9th Cir. 1996)). Thus, despite the causal connection, Defendant had a legitimate, non-discriminatory reason for an examination. Plaintiff admitted she believed her migraines became more frequent in 2001 and she admits she moved some twenty times a tour because of her fragrance sensitivity. Plaintiff has not shown by a preponderance of the evidence that the legitimate, non-discriminatory reason for a fitness for duty examination was pretextual or false.

Accordingly, the Court concludes there is no genuine issue of material fact as to this issue. Therefore, that aspect of Defendant's summary judgment motion which seeks a summary judgment on Plaintiff's claims that Defendant retaliated against Plaintiff for protected activity when it sent her for a fitness for duty medical examination on July 17, 2001 [Doc. No. 41] will be **GRANTED**.

### b.    Letter of Warning

Defendant asserts it did not engage in disability discrimination or retaliation for any protected activity when the LOW for absenteeism was given on January 14, 2003 [Doc. No. 42 at 44]. Defendant argues Plaintiff's absences were a legitimate, non-retaliatory reason for the LOW, and Plaintiff cannot show she was treated differently with respect to any similarly situated REC employees with respect to the issuance of the LOW [*id.* at 45-47].

Plaintiff asserts she was subjected to retaliation and disability discrimination when she was given the LOW [Doc. No. 56 at 61]. Plaintiff asserts she received the LOW after she filed a request for reasonable accommodation in November 2002 [*id.*]. Plaintiff also asserts the LOW was an adverse employment action in that it was part of the progressive discipline process which could have

eventually led to her termination (and left her homeless) [*id.*]. She admits, however, that Miller, the supervisor who issued the LOW, had the discretion to discipline Plaintiff by issuing the LOW [*id.* at 62].

Under *Michael*, 2007 WL 2176220 at * 8, the LOW constituted an adverse employment action because it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[8] Defendant, however, has articulated a legitimate, non-discriminatory reason for the issuance of the LOW; namely, Plaintiff's unscheduled absences which were not protected by the FMLA. Even viewing the facts in the light most favorable to Plaintiff, she has not established by a preponderance of the evidence that this legitimate, non-discriminatory reason articulated by Defendant is a pretext for discrimination.

Miller testified the USPS had a policy that employees "are to be regular in attendance" [Doc. No. 57, Exhibit 18 at 214]. Miller testified unscheduled absences are considered to be "not regular in attendance." [*Id.* at 215]. Miller stated there was no written policy as to the number of absences in a short period of time which warranted discipline, but stated she thought three or four unscheduled absences per month warranted discipline [*id.* at 216]. Miller also stated she did not consider FMLA-protected absences for discipline [*id.*].

Miller further testified that after Plaintiff exhausted her FMLA absences in 2002 and had three or four absences per month, she decided to issue discipline [*id.*]. Miller stated she met with Plaintiff before issuing the discipline, and Plaintiff told her most of her absences related to migraines

---

[8] There is little to no evidence Plaintiff actually suffered any employment-related adverse consequences from the LOW as it was only the first step in a series of progressive discipline and it was eventually pulled from Plaintiff's personnel file at the REC as the result of a Union grievance she filed concerning the LOW. Plaintiff did, however fear she may become homeless if terminated.

and the perfume policy at work [*id.* at 216-17]. Miller stated she thought REC management was enforcing the fragrance policy and there was nothing more in the way of controlling fragrances in the workplace that could be done, so she decided to issue the LOW [*id.* at 217-18]. Miller stated she considered Plaintiff's absences and that none of her absences were FMLA protected [*id.*].

Miller also stated she issued a LOW to Garvich because she had at least three or four unscheduled absences during the same period [*id.* at 218-19]. Miller also identified another REC employee, who was neither disabled nor had ever filed an EEOC complaint, and who was given discipline for unscheduled absences during the same time period [*id.* at 220-21].

Miller was also asked about another REC employee, Joy Mayes, an allegedly similarly situated employee [*id.* at 224]. Miller stated Mayes did not have unscheduled absences similar to Plaintiff's absences which warranted discipline because Mayes' absences were FMLA protected [*id.* at 224]. Plaintiff argues the use of the term "understood" in Miller's declaration amounts to an admission that Mayes' absences were not FMLA-protected absences [Doc. No. 56 at ¶ 119]. Plaintiff interprets the word "understood" in Miller's declaration to mean Miller thought Mayes' absences were FMLA protected, but they were not [*id.*]. However, Plaintiff's argument ignores Miller's unequivocal deposition testimony that Mayes did not have the same number of unscheduled absences to warrant discipline as Plaintiff because Mayes absences were FMLA protected [Doc. No. 57, Exhibit 18 at 224]. Plaintiff has presented no evidence to dispute Defendant's evidence that Mayes and Plaintiff were not similarly situated. Even if Plaintiff met the causal connection prong, however, she has not established pretext.

Plaintiff cites the testimony of Player as proof the LOW was a pretext for discrimination. Player testified that at some point Miller told her Plaintiff was running out of FMLA leave [Doc. No.

56, Exhibit 19 at 44]. Player stated she told Miller "just to track the attendance." [*Id.*]. Player testified she did not know Plaintiff had requested a reasonable accommodation from the Reasonable Accommodation Committee at the time Miller came to her [*id.* at 45]. Player stated that if she had known Plaintiff had a request for a reasonable accommodation pending, she would have recommended that Miller refer the issue to the Reasonable Accommodation Committee rather than issuing a LOW [*id.* at 46]. This does not demonstrate pretext. Plaintiff cannot establish by a preponderance of the evidence that Miller's stated reason for issuing the LOW, that Plaintiff had at least three unscheduled absences in a month after exhausting her FMLA leave, was a false pretext. Therefore, that aspect of Defendant's summary judgment motion which seeks a summary judgment on Plaintiff's claims that Defendant discriminated and retaliated against Plaintiff for protected EEOC activity when she was issued a LOW for absenteeism on January 14, 2003 [Doc. No. 41] will be **GRANTED**.

### c.    204B Acting Supervisor

Defendant asserts it did not engage in disability discrimination or retaliation when Dana Wheeler, rather than Plaintiff, was selected as acting supervisor (204B supervisor) on March 3, 2003 [Doc. No. 42 at 47][9]. Defendant asserts Plaintiff was not given the acting supervisor position because she simply could not perform the duties of the position [*id.*].

_____

[9] Defendant concedes Plaintiff exhausted her administrative remedies before the EEOC with regard to her claim she was retaliated against when she was not selected for the Acting Supervisor or 204B Supervisor position on March 3, 2003 [Doc. No. 42 at 2-3]. Plaintiff asserts there were other occasions when she applied for an Acting or 204B Supervisor position and was not selected [Doc. No. 56 at 63]. No evidence as to the circumstances surrounding the other occasions when Plaintiff applied for the Acting or 204B Supervisor position was submitted in connection with this motion. Therefore, Plaintiff's assertion there were other occasions when she applied for and was denied an Acting or 204B Supervisor position were not considered in connection with the instant motion.

Plaintiff asserts the USPS's decision not to award her the 204B acting supervisor position in March 2003 was a violation of the ADA [Doc. No. 56 at 62-64]. Plaintiff asserts that in 2003, McCollum made the decision to deny the position to Plaintiff because of her fragrance sensitivity and attendance record [*id.*]. Plaintiff asserts that if she "had been provided the proper reasonable accommodation, or . . . if the Defendant's internal policy with regard to fragrances had been enforced, she would have no difficulty interacting with other employees at the Postal facility." [*Id.*] Plaintiff further asserts McCollum's decision to deny the position to Plaintiff was unlawfully based on her disability, her migraines/fragrance sensitivity impairment and her unpredictable absences [*id.* at 64].

Player testified that McCollum made the decision concerning the 204B supervisor position in 2003 [Doc. No. 57, Exhibit 19 at 35]. In his declaration, McCollum stated:

> [Plaintiff's] application for 204B was denied because it was determined that her conditions prevent her from doing the essential duties and responsibilities of a 204B acting supervisor. The 204B supervisors (or acting supervisors) receive training to become a 204B supervisor and have the responsibilities of a regular supervisor, thus attendance is very important. They also could have to fill in for a regular supervisor at any time. All supervisors have to come into close contact with a large number of employees during the day on a regular basis and must be able to interact with them.

[Doc. No. 43, Exhibit E at14].

McCollum testified he made the decision to put Wheeler in as 204B supervisor in the Spring of 2003 [Doc. No. 57, Exhibit 20 at 38-39]. McCollum stated at the time he put Wheeler in as the 204B supervisor in April 2003, the REC was fifteenth in productivity and by September 2003 it had moved up to eighth in productivity [*id.* at 39]. McCollum stated if the REC had remained at fifteenth in productivity, it would have been one of four Remote Encoding Centers closed by the USPS that

year [*id.*].  McCollum stated he made the decision to put Wheeler in as 204B supervisor in 2003 based upon recommendations from Miller and Lee [*id.* at 40].  McCollum stated that after Wheeler trained with Klecshka, Klecshka also thought Wheeler could perform the 204B position [*id.* at 40-41].

McCollum also testified he did not believe Plaintiff could do the 204B job in running the system because:

> There's just a lot of interaction with all the employees.  There's a lot of movement that you have to be able to do to be able to move the employees.  There's . . . you're on your feet pretty much constantly all night long . . . we've tried other people, and some, it just doesn't work out.  Some want to use the loud speaker to announce moves all over the floor, well, you can't do that, because it interrupts everybody else that's trying to concentrate.  And [Wheeler] was good about being able to go to the site and say, I want you to move.  I want you to move.  And if she needed certain people in certain sites she could do that.  And you need a rapport with the plants, since we have eighteen different plants.  I require a phone call every day to each one of the plants when they come in.. . . And you get a rapport with the plants, and you understand where they're coming from.  You get to talk to the same person every day.  And you get to know the people that can key, and [Plaintiff] didn't have the attendance for any of that.  I mean the job is so important that there've been times that if we had used [Plaintiff], with being out a couple days a week, you couldn't have developed a rapport.  You couldn't have come up with a good way to run the system.  You really needed to be involved in what was going on on a day-to-day basis.

[*Id.* at 41-42].

McCollum also stated not being at work on a regular basis would affect the 204B Supervisor's ability to run the system because:

> different mail is run on different days, like I say, like Mondays, we know certain plants are gonna be heavier, they're gonna run different mail.  You've got to be able to get an idea of what's coming.  Even though we have attachments that show the mail that they say they're gonna send, you've got to be able to know who called, and when to

> call, or if they're having a problem. I would say that [204B] person
> is the most important person in the building on our operational side,
> the way that they can save us hours, and move people and get the mail
> out.

[*Id.* at 43].

The testimony shows that regular attendance is a requirement of the acting supervisor or 204B position. An individual who cannot satisfy the attendance requirements of a position, except in the rare situation where a job can be performed from home, is not considered a qualified individual under the ADA. *Tyndall v. Nat'l Educ. Ctrs., Inc. of Calif.*, 31 F.3d 209, 212-13 (4th Cir. 1994). Again, an employer is not required to accommodate an individual by shifting an essential job function onto other employees. *Hoskins*, 227 F.3d at 729.

Plaintiff asserts she could have performed the 204B position if the REC had afforded her the reasonable accommodation of a fragrance free environment or had enforced its current policy on the light wearing of fragrances. As is discussed above, however, a fragrance free environment at the REC is not a reasonable accommodation. Moreover, as is also discussed above, the evidence, and particularly the testimony of Dr. Hirsch, suggests even greater enforcement of the light fragrance policy likely would not impact the number of fragrance-induced migraines she experiences.

Plaintiff has asserted that because McCollum's decision to deny her the 204B position was "based on the Plaintiff's disability of fragrance induced migraines," McCollum regarded her as disabled in violation of the ADA [Doc. No. 56 at 64][10]. Plaintiff also asserts that because McCollum regarded her as disabled, the USPS must show Plaintiff is unable to perform the essential functions

---

[10]Defendant asserts any claim by Plaintiff that she was mistakenly perceived as having a "disability" when she did not have a disability was not pled in her complaint or administratively exhausted [Doc. No. 61 at 4 n.1 ]. It is not necessary to address this argument.

of the 204B position.  As noted, McCollum testified he did not believe in 2003 that Plaintiff could perform the 204B position because the position required a constant need to move throughout the facility and interact with employees [Doc. No. 57, Exhibit 20 at 41-42].  McCollum also testified regular attendance, which Plaintiff did not have, was a requirement of the 204B supervisor position [*id.* at 41-43].  McCollum further testified as to his reasons for preferring Wheeler for the 204B position.

Plaintiff testified she believed "depend[ing] on what they term essential functions of the job," she could perform the 204B supervisor position "[w]ith accommodation." [Doc. No. 43, Exhibit G at 164].  Plaintiff stated "they would have to do something about . . . the fragrances" and also stated "I would not be able to stand on my feet the entire night." [*Id.*].

The testimony of McCollum does not establish that he regarded Plaintiff as disabled.  At most, McCollum thought Plaintiff's problem with fragrances would create a problem because the 204B position would require Plaintiff to interact with the REC employees.  Further, Plaintiff's own testimony that the REC would have to do something about fragrances and that she would have problems being on her feet for the entire night strongly suggest she could not perform the essential functions of the 204B position.

Plaintiff has not met her burden of demonstrating pretext by a preponderance of the evidence.  She has not shown that the stated reasons for not giving her the position, including that the position was given to Wheeler by McCollum because he believed she was better able to perform the position than Plaintiff, are false or a pretext.

Accordingly, that aspect of Defendant's summary judgment motion which seeks a summary judgment on Plaintiff's claims that Defendant discriminated or retaliated against Plaintiff for

protected activity when she was not selected as an Acting or 204B Supervisor on March 3, 2003 [Doc. No. 41] will be **GRANTED**.

<strong>d.      Level 5 Trainer Position</strong>

Defendant asserts it did not engage in disability discrimination when it removed Plaintiff from the level 5 temporary trainer position [Doc. No. 42 at 47-48]. Plaintiff asserts the decision to remove her from the level 5 trainer position was discriminatory [Doc. No. 56 at 67]. Specifically, Plaintiff asserts the decision of Lee to remove Plaintiff from the level 5 position was a direct violation of the ADA [*id.*]. Plaintiff asserts that the decision to step her down from the level 5 work was related to her alleged disability, her back condition [*id.* at 68]. Plaintiff further asserts the absences, "which allegedly disqualified her from consideration for level 5 assignments were primarily based on her impairment of migraines." [*Id.* at 70]. She also contends there were other level 5 positions she could perform [*id.* at 71].

Lee testified the position was filled and that Plaintiff "was more or less filling in for someone that had a position that was not able to do that job at the time." [Doc. No. 57, Exhibit 18 at 310-11]. Lee stated "we would get volunteers for employees to fill in for those positions, if the group leader was acting as a supervisor. And so [Plaintiff] was acting temporarily in that she was filling in for someone else that already had the position, that was doing something else." [*Id.* at 311]. Lee stated Plaintiff was removed from the position, but she was not demoted because she did not officially have the level 5 group leader position [*id.* at 311-12].

Lee also stated there was a higher rate of pay associated with the level 5 position, but she determined Plaintiff was not an appropriate employee for that position [*id.* at 312]. Lee stated Plaintiff "wasn't reliable. She wasn't dependable, and the job needed it." [*Id.*]. Lee further stated

when she removed Plaintiff from the level 5 job, Plaintiff "appeared to already be injured." [*Id.* at 313]. Lee stated that based upon her perception of Plaintiff's physical condition, the level 5 position "was having an impact on her ability to do the job, and her regularity and dependability in being there." [*Id.*]. Lee stated she felt the reason Plaintiff might have been absent, "might have been related to her back." [*Id.* at 214]. Lee also testified that, at some point while working the level 5 position, Plaintiff told Lee she was in pain [*id.* at 315].

The level 5 position required Plaintiff to be on her feet for a considerable portion of the time, which she admits aggravated her back. Plaintiff testified being on her feet for a good portion of the time aggravates her back [Doc. No. 43, Exhibit G at 167]. Lee, the supervisor, who made the decision to remove Plaintiff from the level 5 trainer position, testified Plaintiff told her she was in pain while she performed the level 5 position for about three weeks. Further, Plaintiff also testified that while performing the level 5 position, she chose employees to train who were not fragrant.

As is discussed above, Plaintiff's impairments, separately or in combination, do not constitute a disability under the Rehabilitation Act. Lee removed Plaintiff from the position because of her absences and her concern that working the level 5 position was causing Plaintiff pain. Although Lee testified she thought working in the level 5 position was aggravating Plaintiff's back and causing Plaintiff pain, as Plaintiff apparently admitted to Lee, the circumstances do not show Lee regarded Plaintiff as disabled.

Accordingly, I conclude Defendant has established there is no genuine issue of material fact as to this issue. Therefore, that aspect of Defendant's summary judgment motion which seeks a summary judgment on Plaintiff's claims that Defendant discriminated against Plaintiff due to a disability when she was removed from temporarily performing a higher level clerk (level 5 rather

than level 4) position [Doc. No. 41] will be **GRANTED**.

### 6.      Hostile Work Environment Claims

Defendant asserts Plaintiff has not been subjected to an abusive or hostile work environment [Doc. No. 42 at 48-53].  Plaintiff asserts she was subjected to unlawful harassment based upon her disability [Doc. No. 56 at 72].  Plaintiff first asserts:

> she suffered harassment by her continued exposure to dangerous fragrances within her workplace despite management's knowledge regarding the effects of this exposure.  The central claim of Plaintiff's cause of action is that, either intentionally or through reckless disregard for the Plaintiff's condition, the Defendant repeatedly exposed her to dangerous fragrances.  This repeated exposure, which triggered Plaintiff's disability, constitutes severe and pervasive harassment based on that disability.

[*id.* at 73].  Plaintiff further asserts that in addition to the above, she was subjected to increased editing standards, sent for a fitness for duty exam, had her personal belongings removed from her workspace and received a LOW [*id.* at 74].  She also claims she and her friends have been called into adversarial meetings; and that following one of the meetings, Plaintiff was threatened by a plant manager [*id.* at 74].

_____To prevail on a claim of a hostile work environment, a plaintiff must show: (1) she is a member of a protected class; (2) she was subject to the unwelcomed harassment; (3) the harassment was based upon her disability and protected activity; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior.  *See Michael*, 2007 WL 2176220 at * 13;  *Downs v. Postmaster General*, 31 F. App'x 848, 850 (6th Cir. Mar. 7, 2002) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).  A hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Both objective and subjective tests must be satisfied to establish a hostile working environment: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.* (quoting *Harris*, 510 U.S. at 21-22). "[I]solated incidents . . . unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Id.* at 850-51 (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000)). A claim of a hostile work environment is "cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's protected status. *Michael*, 2007 WL 2176220 at * 12. Factors which a court should consider in determining whether conduct creates or constitutes a hostile work environment includes "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id.* at 851 (quoting *Harris*, 510 U.S. at 23).

As is discussed in detail above, Plaintiff has not established she has an impairment which substantially limited a major life activity as required by the Rehabilitation Act and her assertion she suffered continued harassment by exposure to dangerous fragrances in the workplace is without merit.

Beyond her claim that Defendant harassed her by exposure to dangerous fragrances in the workplace, Plaintiff also refers to several specific incidents of alleged harassment and/or retaliation. Based upon a review of the record and the pleadings, it appears that the specific incidents of alleged

retaliation and/or harassment cited by Plaintiff include comments by and confrontational meetings with co-workers/management, some keying awards in 1999, removal of personal effects during lunch on apparently one occasion, the fitness for duty examination, the level 5 and 204B supervisor positions, the LOW, a one-day schedule change denied on or about March 15, 2003, editing on March 11, 2003, and a distribution of Mary Kay products [*See* Doc. Nos. 56 & 57, Exhibit 10 at 146].

The incidents involving the fitness for duty examination, level 5 position, 204B supervisor position, and the LOW have been previously discussed in detail. The facts surrounding the Mary Kay incident are not in dispute. Although it is not clear that Plaintiff is currently complaining about the Mary Kay incident, it will be addressed herein since it is raised in the Defendant's pleadings and, in her testimony, Plaintiff stated she believed that allowing the samples into the workplace was an act of harassment toward her [Doc. No. 43, Exhibit G at 206].

With respect to the Mary Kay incident, the REC had a celebration to start the Combined Federal Campaign. The celebration involved several door prizes, one of which was a basket of Mary Kay products donated by a REC employee who sold such products [*id.* at 204-08]. The employee who donated the basket of Mary Kay products also brought in some samples and placed them in the REC breakroom around the door prize [*id.* at 205, 207]. Plaintiff testified that REC employees took the samples and began using or trying them during work [*id.* at 206]. This upset Plaintiff, however, she was able to continue working that night and did not go home with a headache [*id.*]. Plaintiff cannot remember if she complained to any supervisor about the fragrances connected to the Mary Kay samples and admitted she did not know if management knew ahead of time about the Mary Kay samples [*id.* at 206-07]. Plaintiff stated she took some of the Mary Kay samples as evidence for her

case because she believed the presence and use of the samples by her co-workers was an act of harassment [*id.* at 206, 208].

With regard to the Mary Kay situation, a one time incident, although Plaintiff was upset some of her co-workers tried the Mary Kay samples, she worked her shift that evening [Doc. No. 43, Exhibit G at 206-07]. More importantly, Plaintiff admitted she did not know if the REC management had any advance knowledge the samples were to be present and she stated the use of the samples *by her co-workers* was an act of harassment [*id.* at 206-08] (emphasis added).

Plaintiff testified about the editing situation stating there was supposed to be a random edit each week of REC employees [Doc. No. 57, Exhibit 49 at 85-87]. Plaintiff stated there was one instance where she was edited within 13 minutes after she logged onto the REC system [*id.* at 86]. Plaintiff stated it was her understanding the Union contract stated you could not be edited within the first or last 30 minutes of your tour [*id.* at 86-87]. Plaintiff stated she filed a grievance with regard to the fact she was edited within the first 13 minutes but lost because you could be edited within the first 30 minutes [*id.* at 87-88]. Plaintiff stated she understood that employees who were having trouble were edited in the first 30 minutes [*id.* at 88]. Plaintiff stated she saw the term "heightened scrutiny" in the EEOC books, and she thought the way she was edited within the first thirty minutes constituted heightened scrutiny [*id.* at 85].

Plaintiff also claims she was denied a one day schedule change in March 2003. In that regard, McCollum's declaration states, "I denied [Plaintiff's] request for a schedule change in March 2003 because she was needed at work on that Saturday and she was scheduled to work." [Doc. No. 43, Exhibit E at 4, ¶ 15].

All of these incidents, including the meetings, occurring over a nearly five year period, are

neither pervasive enough nor severe enough to create an actionable hostile working environment.

*Downs*, 31 F. App'x at 850-51; *Michael*, 2007 WL 2176220 at * 12. Therefore, that aspect of Defendant's summary judgment motion which seeks a summary judgment on Plaintiff's claims that Defendant created a "hostile work environment" [Doc. No. 41] will be **GRANTED**.

## IV.    Conclusion

For the reasons stated above, Defendant's motion for summary judgment [Doc. No. 41] is **GRANTED** and Plaintiff's claims will be **DISMISSED WITH PREJUDICE**.

A separate judgment will enter.


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE